618 P.2d 423 (1980)
289 Or. 835
STATE of Oregon, Respondent,
v.
Donna Lorraine TOURTILLOTT, Petitioner.
No. 10158; CA 10998; SC 26660.
Supreme Court of Oregon.
Argued and Submitted January 8, 1980.
Decided October 21, 1980.
*424 James E. Mountain, Jr., Deputy Public Defender, Salem, argued the cause for petitioner. With him on the brief was Gary D. Babcock, Public Defender, Salem.
Karen Green, Salem, argued the cause for respondent. With her on the brief were James A. Redden, Atty. Gen., and Walter L. Barrie, Sol. Gen., Salem.
Before DENECKE, C.J., TONGUE, HOWELL, LENT, LINDE and PETERSON, JJ., and TANZER, Justice Pro Tempore.
PETERSON, Justice.
The decision in this case turns on the applicability of ORS 131.615 and the requirements of the state and federal constitutions. Three issues are presented for our determination:
1. Do police game checkpoint stops violate ORS 131.615 when there is neither probable cause to believe nor reasonable suspicion that a crime has been committed?
2. Are game checkpoint stops violative of Article I, section 9, of the Oregon Constitution or the Fourth Amendment to the Constitution of the United States when there is neither probable cause to believe nor reasonable suspicion that a crime has been committed?
3. If a police officer makes a valid checkpoint stop followed by an inquiry which would be permitted in connection with the purpose of the checkpoint stop, should the evidence obtained as a result of the inquiry be suppressed if the officer's purpose in making the inquiry was unconnected with the purpose for making the stop?
The defendant was convicted of a Class C felony, driving with a revoked license,[1] and was sentenced to imprisonment for one year. Execution of the sentence was suspended and the defendant was then placed on probation. Alleging that the circuit court erred in denying her motion to suppress evidence obtained when she was stopped by an Oregon State Police game officer, she appealed the conviction. The Court of Appeals affirmed, 43 Or. App. 5, 602 P.2d 659 (1979). We accepted review to examine the legality of game checkpoint stops where there exists neither probable cause to believe nor reasonable suspicion that a game law, or any other law, has been violated.

The Facts
The defendant was stopped at a roadblock located on a highway between Powers and Agness, Oregon, just south of the Powers city limits. The roadblock, manned by an officer of the Oregon State Police Game Division,[2] was set up to check hunters' compliance with the game laws, to check hunting licenses and to gather statistics on hunter success on the opening day of deer hunting season, October 1, 1977. According to the trial judge, the roadblock was established "on one of the most rural highways *425 in the whole state of Oregon." A sign stating "Attention Hunters" and "All Vehicles Must Stop" was placed on the side of the road, and the police officer's vehicle, with a sign on its side indicating its ownership, was parked at a right angle to the road.
As automobiles approached, the officer, wearing a uniform and badge, stood in the center of the road and held out his hand to stop approaching vehicles. If the car contained older people or others who did not appear to have been hunting, the officer would sometimes permit them to continue after they slowed or stopped.
The defendant was driving a friend's car toward Powers. She stopped near the officer. The officer testified that he noticed nothing unusual about the manner in which the defendant operated the automobile, nor did he observe anything unusual about the defendant. After the defendant stopped, the officer asked for identification or a driver's license. The defendant responded that she was suspended and had no driver's license.
According to the officer, it was standard operating procedure to ask those stopped at game checks to produce a driver's license or identification if a hunting license was not produced.
Petitioner contends that the stop violated ORS 131.615, Article I, section 9, of the Oregon Constitution, and the Fourth Amendment of the United States Constitution[3] because the stop was "not based upon any reasonable suspicion that the defendant had been involved in criminal activity." She also contends that even if the stop was permissible, the officer's subsequent request for a driver's license or identification was impermissibly intrusive. We consider first the contention that the stop violated ORS 131.615.[4]

I. Applicability of ORS 131.615
ORS 131.615 provides:
"(1) A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that he is a peace officer, make a reasonable inquiry.
"(2) The detention and inquiry shall be conducted in the vicinity of the stop and for no longer than a reasonable time.
"(3) The inquiry shall be considered reasonable only if limited to the immediate circumstances that aroused the officer's suspicion."
An analysis of the legislative history of ORS 131.615 makes it clear that the legislature did not intend to limit all "stops" for law enforcement purposes to those permitted under ORS 131.615.
The Oregon Legislature created the Criminal Law Revision Commission in 1967 to revise Oregon law relating to crime and criminal procedure. Or. Laws 1967, ch. 573, § 2. Preliminary work on the Criminal Procedure Code began in 1970. The first preliminary draft of Article 5, relating to search and seizure, was presented in January, 1971.
The preliminary draft on search and seizure included a prohibition against searches or seizures[5] not specifically authorized in *426 the Code. Section 2 of the draft, entitled "prohibition of unauthorized searches and seizures," provided:
"No search or seizure shall be authorized or executed otherwise than in accordance with the provisions of Article ____ [stop and frisk provisions to be drafted, probably to be included in the Article dealing with investigation of crime presently covered in Article 2, Tent. Draft No. 2 of the MCP],[[6]] and sections 3 through 15 of this Article and Article 27 of the Oregon Criminal Code of 1972 (eavesdropping)." Criminal Procedure Code, Preliminary Draft No. 1, Part II. Pre-arraignment Provisions, Article 5, § 2 (January, 1971).
The commentary to the preliminary draft stated:
"This section prohibits all searches and seizures except those specifically allowed in other sections of this Article (e.g., searches and seizures pursuant to a warrant, incidental to an arrest), the provisions of the stop and frisk sections yet to be drafted and the electronic eavesdropping provisions presently included in Article 27 of the Oregon Criminal Code of 1971.
"* * *.
"No comparable provision exists in Oregon legislation on the general level of the proscription in this section. Like most other states the Oregon statutes in the search and seizure field (or lack of such statutes) leave to implication the prohibition of unauthorized searches and seizure. In a few instances ORS specifically authorizes seizures. See ORS 164.368 (stolen Christmas trees); 167.540 and 167.555 (gambling devices); 142.080 (vehicles used to transport stolen property). The silence of the legislature with respect to the kinds of searches and seizures which are permissible leaves the policy limits to be determined by the courts based on their notions of what is constitutionally permissible. Such a failure by the legislature has the effect of authorizing any search which the Constitution does not prohibit.

"Statutes should, as pointed out in the MCP commentary (Ten. Draft No. 3, p. 10), `be so phrased as to leave a certain amount of judicial elbow room for the exercise of discretion. But it is believed that there should be a statutory basis for every search and that searches lacking such a basis should be explicitly prohibited.'" (Emphasis added.)
Substantially the same provision was retained in Preliminary Draft Number 3, submitted in May, 1972. On June 5, 1972, Subcommittee Number 2 of the Commission adopted the section. When the Commission considered it on June 16, 1972, however, Section 2 was deleted by a unanimous Commission. Professor George Platt, the Commission reporter, stated:
"I would certainly hope that this section be retained because it asserts again the legislature as the ultimate decision maker as to what search and seizure should consist of * * *. If there is no prohibition on searches not specifically authorized, then the police and the various agencies would have the flexibility, as they describe it, of being able to search, and I think that it ought to be a definite affirmative definition by the legislature as to whether they should search." Criminal Law Revision Commission (June 16, 1972), Tape 11, side 2, at 336.[7]
Senator Anthony Yturri, Commission Chairman, then stated he believed that the section was "too restrictive and should be deleted." Id., Minutes at 37. After a discussion on this point, the section was deleted.
Five of the six legislators appointed to the Commission and present at the June 16, *427 1972, meeting were members of the 1973 legislature, which adopted the Criminal Procedure Code without any provision prohibiting searches or seizures not authorized by the Code. Or. Laws 1973, ch. 836, §§ 81-121. One member, Senator John Burns, was a member of the Senate Judiciary Committee which held hearings on the Code. Testimony before the Judiciary Committee brought the deleted Section 2 to the committee's attention. See Hearings on SB 80 Before the Senate Judiciary Committee, 57th Or.Legis.Ass'y, Exhibits at 110-114 (Testimony of Jackson L. Frost). The provisions prohibiting searches and seizures other than those authorized by statute continued to be omitted.
The significance of this legislative history is that the Commission knowingly and explicitly rejected proposed provisions that the Code was intended to completely define the scope of permissible search and seizure.[8]
Additionally, the language of ORS 131.615 limits its application to investigations of crime where reasonable suspicion of criminal activity has focused upon a particular individual. Checkpoint stops, or any other stop where there is no individualized suspicion of criminal activity, do not fall within this language.
Police, in performing their assigned functions, stop persons in a variety of ways and for a variety of reasons. For example, they may stop a motorist to warn of a washout ahead and learn, by looking into the car, of evidence leading to the arrest of the driver or an occupant. We believe that the legislature considered and rejected a rule permitting only stops based upon reasonable suspicion or probable cause. We conclude that the legislature did not intend to prohibit game checkpoint stops by enacting ORS 131.615.

II. Constitutionality of Game Checkpoint Stops
Both Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution impose limitations on search and seizure "in order to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." United States v. Martinez-Fuerte, 428 U.S. 543, 554, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976). See Delaware v. Prouse, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979); Pennsylvania v. Mimms, 434 U.S. 106, 108-09, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977). Under Article I, section 9, of the Oregon Constitution, we must accord the defendant at least as much protection as that provided by the Fourth Amendment of the Constitution of the United States, although we are at liberty to adopt a stricter test under our own constitution. State v. Greene, 285 Or. 337, 339, 591 P.2d 1362 (1979); State v. Flores, 280 Or. 273, 279-81, 570 P.2d 965 (1977); State v. Florance, 270 Or. 169, 183, 527 P.2d 1202 (1974). See also State v. Elkins, 245 Or. 279, 282, 422 P.2d 250 (1966). We will therefore examine the constitutional question in the light of the Fourth Amendment analyses of the Supreme Court of the United States.
*428 The rationale underlying Supreme Court decisions in the area of Border Patrol activity and enforcement of driver license and vehicle registration laws suggests that game checkpoints, including the one at issue, may be maintained without violating Fourth Amendment rights. The efforts of the Border Patrol to stem the flood of illegal aliens entering the United States have been the focus of a line of Supreme Court decisions concerned with the application of search and seizure principles. United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), reviewed the Court's holdings in several earlier cases, and set out the constitutional limitations on Border Patrol activity. 428 U.S. at 555-561, 96 S.Ct. at 3081. A roving patrol unit could search a vehicle for illegal aliens only if there existed probable cause to believe the car searched contained illegal aliens. Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). Similarly, the Border Patrol could search a vehicle at a permanent checkpoint only where probable cause existed for the belief that the car contained illegal aliens. United States v. Ortiz, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975). A roving patrol could stop motorists, in the general area of the border, for a brief inquiry into the motorists' resident status, if the stop was supported by specifically articulable facts, reasonably warranting suspicion that the vehicle contained illegal aliens. United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Finally, at fixed checkpoints the Border Patrol, even in the absence of reasonable suspicion, may stop, question, and visually inspect all vehicles passing through the checkpoint. United States v. Martinez-Fuerte, supra. The Supreme Court noted that the same objective intrusion upon Fourth Amendment interests (a stop, questioning, and visual inspection) existed in the roving-patrol stops (Brignoni-Ponce) and in the fixed checkpoint stops (Martinez-Fuerte.) 428 U.S. at 558-559, 96 S.Ct. at 3083.
However, in upholding a checkpoint stop in Martinez-Fuerte, the Court noted that at a checkpoint stop, the degree of "subjective intrusion-the generating of concern or even fright on the part of lawful travelers-is appreciably less * * *." 428 U.S. at 557-558, 96 S.Ct. at 3082 (see page 433 of this opinion).
Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) was concerned with the issue of whether the Constitution permitted a spotcheck, for the purpose of checking the driving license and registration of the car, conducted by a roving patrolman, who had neither probable cause nor reasonable suspicion to believe that the car was being operated contrary to the motor vehicle laws. The Court noted that "the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." 440 U.S. at 653-654, 99 S.Ct. at 1395. The Court in Prouse heavily relied on the Border Patrol cases for "guidance in balancing the public interest against the individual's Fourth Amendment interests implicated by the practice of spot checks * * * [that] occurred in this case." 440 U.S. at 657, 99 S.Ct. at 1397.
The Court compared the effect of the police procedure in Prouse with those in Brignoni-Ponce and Martinez-Fuerte:
"* * * We cannot agree that stopping or detaining a vehicle on an ordinary city street is less intrusive than a roving-patrol stop on a major highway [the situation in Brignoni-Ponce] and that it bears greater resemblance to a permissible stop and secondary detention at a checkpoint near the border [the situation in Martinez-Fuerte] * * *.
"* * * We cannot assume that the physical and psychological intrusion visited upon the occupants of a vehicle by a random stop to check documents is of any less moment than that occasioned by a stop by border agents on roving patrol. Both of these stops generally entail law enforcement officers signaling a moving automobile to pull over to the side of the roadway, by means of a possibly unsettling show of authority. Both interfere *429 with freedom of movement, are inconvenient, and consume time. Both may create substantial anxiety. For Fourth Amendment purposes, we also see insufficient resemblance between sporadic and random stops of individual vehicles making their way through city traffic and those stops occasioned by roadblocks where all vehicles are brought to a halt or to a near halt, and all are subjected to a show of the police power of the community. `At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion.' Id. at 422 U.S. 894-895, 95 S.Ct. 2585, [2587,] 45 L.Ed.2d 623, quoted in United States v. Martinez-Fuerte, 428 U.S. at 558, 96 S.Ct. at 3074, 49 L.Ed.2d 1116." Prouse, supra, 440 U.S. at 657, 99 S.Ct. at 1398.
The Court, in addition to its "subjective intrusion" analysis, considered the efficiency of the device chosen by the police-the roving stop-to meet the important ends of ensuring highway safety. The Court found that discretionary spot checks were not a "sufficiently productive mechanism to justify the intrusion upon Fourth Amendment interests which such stops entail." Prouse, supra, at 659, 99 S.Ct. at 1399.
The Court also held that the discretionary spotcheck, as practiced in Delaware, did not sufficiently circumscribe the discretion of the official in the field. Id. at 661, 99 S.Ct. at 1400.
Balancing the promotion of legitimate government interests against the psychologically and physically intrusive nature of the spotcheck procedure, the general inefficiency of the method in promoting the desired goal of highway safety, and the degree of discretion it vested in the individual officer, the Court found the practice of discretionary spot checks as practiced in Delaware violated the Fourth Amendment. Id. at 663, 99 S.Ct. at 1401.
The Court made it clear, however, that checkpoint stops are not precluded, for Justice White added this caveat:
"* * * This holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative. We hold only that persons in automobiles on public roadways may not for that reason alone have their travel and privacy interfered with at the unbridled discretion of police officers. * * *" 440 U.S. at 663, 99 S.Ct. at 1401 (emphasis added).
The concurring opinion of Justice Blackmun anticipated the very issue in the case at bar:
"The Court, ante, at this page, [440 U.S. at 663, 99 S.Ct. at 1400-1401, 59 L.Ed.2d, at 673,] carefully protects from the reach of its decision other less intrusive spot checks `that do not involve the unconstrained exercise of discretion.' The roadblock stop for all traffic is given as an example. I necessarily assume that the Court's reservation also includes other not purely random stops (such as every 10th car to pass a given point) that equate with, but are less intrusive than, a 100% roadblock stop. And I would not regard the present case as a precedent that throws any constitutional shadow upon the necessarily somewhat individualized and perhaps largely random examinations by game wardens in the performance of their duties. In a situation of that type, it seems to me, the Court's balancing process, and the value factors under consideration, would be quite different." 440 U.S. at 663-664, 99 S.Ct. at 1401.
The game checkpoint stop exercised by the patrolman in this case must be examined in the light of the factors set out in the Border Patrol cases and Prouse. The policy sought to be implemented by the procedure is the enforcement of the state's game and wildlife laws. Balanced against this government interest is the defendant's right to be free from unreasonable seizures. A preliminary consideration is that "one's *430 expectation of privacy in an automobile and of freedom in its operation are significantly different from the traditional expectation of privacy and freedom in one's residence." Martinez-Fuerte, supra, 428 U.S. at 556, 96 S.Ct. at 3082. Furthermore, since all the vehicles were stopped or slowed at the checkpoint, the degree of psychological and physical intrusion occasioned by the stop here is clearly more analogous to that found permissible in Martinez-Fuerte than to those in Brignoni-Ponce and Prouse.
Secondly, the procedure here appears to be more effective in meeting its ultimate goal than was the one chosen in Prouse. In 1977, 412,100 hunting licenses were sold in Oregon,[9] which then contained about 2.4 million people.[10] Recreational hunting and fishing licenses sold in Oregon in 1977 totalled 1,048,158.[11] Over one-half of Oregon's 96,981 square miles is publicly owned.[12] These statistics highlight the task which faces game law enforcement personnel in carrying out the wildlife policy of this state. The broad expanse of territory in Oregon, much of which is virtually uninhabited, makes law enforcement difficult. The checkpoint was established on the first weekend of hunting season. It was placed on an isolated road where hunting activity was to be expected.[13] Thus, the method chosen would be one of the most effective ones to meet its goals.
Although the record herein is barren of reference to regulations or policies of the Game Commission or police, the record shows that the operation of the actual roadblock was much the same as in Martinez-Fuerte. Every motorist was stopped or slowed sufficiently for the policeman to make a decision as to whether a further inquiry was called for. There was no exercise of discretion in the sense that the policeman would pull over any vehicle based upon a "hunch." The fact that the roadblock was set during hunting season, in an area frequented by hunters, and subjected all vehicles to being stopped or slowed circumscribes the possibility of an abuse of discretion on the patrolman's part.
We conclude that the governmental interest in the enforcement of laws for the preservation of wildlife in this state is sufficiently substantial to justify the minimal intrusion upon the Fourth Amendment rights of those stopped for brief questioning and a visual inspection of their vehicles. On the facts of this case we hold that the roadblock stop was not unreasonable under either the Fourth Amendment of the United States Constitution or Article I, section 9, of the Oregon Constitution.[14]

*431 Discussion of the Dissent

The dissenting opinion does not view the Supreme Court cases as requiring that the challenged law enforcement activity be determined by the balancing test articulated in Prouse, supra, 440 U.S. 654 et seq., 99 S.Ct. 1396 et seq. Instead, the dissent concludes that the Supreme Court has developed different rules governing law enforcement officers in their law enforcement activities, depending upon the activity involved. One rule governs law enforcement officials in their crime enforcement or crime detection activities, and one rule governs law enforcement activity in "administrative investigations."
The dissent points out that the administrative search[15] rule requires a suitable warrant procedure[16] in order to search premises. The dissent does not find it necessary to determine whether a warrant is required in this case. The dissent would require, at least, a properly authorized administrative program designed for appropriate agency management purposes, systematically administered to achieve some statutory objective, and not involving the unconstrained exercise of discretion by the law enforcement person.
The dissent states that the Terry rule[17] is applicable to crime enforcement or crime detection activities of law enforcement officers. Under Terry, a stop and pat-down search may not be made unless the circumstances raise a suspicion of criminal conduct.
The dissent maintains that the result in any given case turns on an examination of the type of law enforcement activity involved. If the law enforcement persons are making an administrative stop for regulatory rather than criminal law enforcement purposes, the rule governing administrative inspections applies.
The dissent concludes (dissent, page 448) that the stop at bar was impermissible because
"* * * the state has not demonstrated that defendant was stopped pursuant to a properly authorized administrative program designed for preventive or wildlife management purposes and including the necessary safeguards * *."
There are several important factors that the dissenting opinion fails to consider, or considers of secondary importance. The first factor is that this case does not involve a search. The panoply of case law which the dissent seeks to bring this case within[18] involves searches. Justice Powell, speaking for the majority in one of the border patrol search cases, Ortiz, supra, made this distinction clear:
"While the differences between a roving patrol and a checkpoint would be significant in determining the propriety of the stop, which is considerably less intrusive than a search, * * * they do not appear to make any difference in the search itself." 422 U.S. at 895, 95 S.Ct. at 2588.
*432 The second factor which the dissenting opinion fails to adequately consider is that the rule espoused by the dissent as being applicable to administrative searches arose from efforts to conduct warrantless searches of premises. Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), involved an attempted search of a house. See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967), and Marshall v. Barlow's, Inc., 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), involved attempts to search business premises.
The Supreme Court has, for many years, distinguished between searches of premises and searches of automobiles. This point was made by the Supreme Court in its recent border patrol cases. See the concurring opinion of Justice Powell in Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). Justice Powell opined:
"* * * The search of an automobile is far less intrusive on the rights protected by the Fourth Amendment than the search of one's person or of a building. This Court `has long distinguished between an automobile and a home or office.' * * *
"The conjunction of these factors-consistent judicial approval, absence of a reasonable alternative for the solution of a serious problem, and only a modest intrusion on those whose automobiles are searched-persuades me that under appropriate limiting circumstances there may exist a constitutionally adequate equivalent of probable cause to conduct roving vehicular searches in border areas." 413 U.S. at 279, 93 S.Ct. at 2542.
The third factor which the dissenters fail to properly consider is that the result in all of the cases cited by them has turned on this test:
"* * * [T]he permissibility of a particular law-enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests * * *." Prouse, supra 440 U.S. at 653-654, 99 S.Ct. at 1396.
One application of the balance test is in the administrative search cases (Camara, See, Marshall), Camara, supra 387 U.S. at 534-35, 87 S.Ct. at 1733, with the result that a warrant for entry was required.[19] In the Border Patrol cases, the same balancing test was applied, with the result that a warrant was not required. This was made clear in Martinez-Fuerte, supra.
"* * * In delineating the constitutional safeguards applicable in particular contexts, the Court has weighed the public interest against the Fourth Amendment interest of the individual, United States v. Brignoni-Ponce, supra, [422 U.S.], at 878, 95 S.Ct. 2574 [at 2578], 45 L.Ed.2d 607; Terry v. Ohio, 392 U.S. 1, 20-21, 88 S.Ct. 1868 [at 1879,] 20 L.Ed.2d 889 (1968), a process evident in our previous cases dealing with Border Patrol traffic-checking operations." 428 U.S. at 555, 96 S.Ct. at 3081.
The Supreme Court upheld the stop in Martinez-Fuerte, supra. The actual balancing was described by the Supreme Court as follows:
"While the need to make routine checkpoint stops is great, the consequent intrusion on Fourth Amendment interests is quite limited. The stop does intrude to a limited extent on motorists' right to `free passage without interruption,' Carroll v. United States, 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543, 39 A.L.R. 790 (1925), and arguably on their right to personal security. But it involves only a brief detention of travelers during which
"`"[a]ll that is required of the vehicle's occupants is a response to a brief question or two and possibly the production of a document evidencing a right to be in the United States."' United States v. Brignoni-Ponce, supra *433 [422 U.S. 873], at 880, 95 S.Ct. 2574, [at 2579,] 45 L.Ed.2d 607.
"Neither the vehicle nor its occupants are searched, and visual inspection of the vehicle is limited to what can be seen without a search. This objective intrusion-the stop itself, the questioning, and the visual inspection-also existed in roving-patrol stops. But we view checkpoint stops in a different light because the subjective intrusion-the generating of concern or even fright on the part of lawful travelers-is appreciably less in the case of a checkpoint stop. * * *" 428 U.S. at 557-558, 96 S.Ct. at 3082.
"Routine checkpoint stops do not intrude similarly on the motoring public. First, the potential interference with legitimate traffic is minimal. Motorists using these highways are not taken by surprise as they know, or may obtain knowledge of, the location of the checkpoints and will not be stopped elsewhere. Second, checkpoint operations both appear to and actually involve less discretionary enforcement activity. The regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorists, that the stops are duly authorized and believed to serve the public interest. The location of a fixed checkpoint is not chosen by officers in the field, but by officials responsible for making overall decisions as to the most effective allocation of limited enforcement resources. We may assume that such officials will be unlikely to locate a checkpoint where it bears arbitrarily or oppressively on motorists as a class. And since field officers may stop only those cars passing the checkpoint, there is less room for abusive or harassing stops of individuals than there was in the case of roving-patrol stops. Moreover, a claim that a particular exercise of discretion in locating or operating a checkpoint is unreasonable is subject to post-stop judicial review." 428 U.S. at 559, 96 S.Ct. at 3083.
In its most recent "roving-stop" case, Delaware v. Prouse, supra, the Supreme Court balanced the intrusion on the individual's Fourth Amendment interests against the law enforcement activity's promotion of legitimate governmental interests. 440 U.S. at 653-54, 99 S.Ct. at 1395. In doing so, the Court stated that the standard of "reasonableness" was imposed "upon the exercise of discretion by government officials, including law-enforcement agents." Id. The balance test required by the Supreme Court binds us, as well, for the Fourteenth Amendment makes the Fourth Amendment applicable to the states.
The test is easily articulated. In determining the constitutionality of a particular government procedure, the promotion of the legitimate government interest at stake is balanced against the individual's right to have his or her privacy and personal security be free from arbitrary and oppressive interference. The Court has considered the following factors to be important:
(1) the importance of the governmental interest at stake;
(2) the psychologically and physically intrusive nature of the procedure;
(3) the efficiency of the procedure in reaching its desired goals; and
(4) the degree of discretion the procedure vests in the individual officers.
No one factor is held to be determinative. As with any balancing test, its application to a particular set of facts may prove to be difficult.
As a preliminary matter, what the procedure was-search or seizure-and where it took place-home, automobile, public street-impacts greatly on the intrusion factor. On the one end of the spectrum is the search of one's home. Nothing is as personal or private. Nothing is more inviolate. Law enforcement officials must have a warrant to enter, absent probable cause and exigent circumstances. Such is the result of the balancing compelled by the Fourth Amendment. One's expectation of privacy and freedom in the operation of an automobile is significantly less than the expectation of freedom and privacy in one's home. A stop of one's automobile is a minimal intrusion compared to a search of one's home.
*434 The Fourth Amendment prohibits unreasonable seizures. Since the key test is reasonableness, the balancing test adopted by the Supreme Court is uniquely adapted to make that determination. The facts and circumstances of each type of seizure must be balanced in determining its permissibility.
The dissent would crank an intermediate step into the analysis-the determination of the type of law enforcement activity involved and determine the result accordingly. We reject the claim that a special test should be applied, depending on the law enforcement activity involved. In this case, the activities of the law enforcement officer were involved, at one and the same time, with criminal law enforcement (the apprehension of violators of the wildlife laws) and administrative law enforcement (gathering game statistics).
The validity of law enforcement practices should not depend on such compartmentalization. Conceivably, circumstances might exist when an OSHA inspector, charged with enforcement of the Occupational Safety and Health Act of 1970, or a Health Department inspector, charged with enforcing health laws, might enter a home or business without a warrant.[20] That case is not before us. But we have no doubt that the resolution of the issue depends, in the first instance, on the same type of analysis as was made in Prouse, Martinez-Fuerte, and Camara, and which we have made in this opinion-balancing the intrusion on the individual's Fourth Amendment rights against the promotion of legitimate governmental interests.
Many law enforcement activities involve, at one and the same time, the enforcement of administrative statutes, rules or regulations which carry a criminal penalty. The result should not turn on whether the criminal law or the administrative law is being enforced.
Hunting and fishing law enforcement is a part of law enforcement. Some law enforcement activities are similar to those involved in apprehending criminals; some may be similar to those of an OSHA inspector or Health Department inspector. Since hunting and fishing in Oregon are usually conducted in rural areas, accessible primarily by automobile, the role of the Oregon State Policeman assigned to the Game Division is similar to that of the Border Patrol officer, whether the officer is on foot patrolling the fish and game areas, in a car, or at a checkpoint.
Finally, on the dissent's point that the state has not demonstrated that defendant was stopped pursuant to a properly authorized administrative program and that the motorists were left to the unconstrained discretion of the officer in the field, there is no claim or suggestion that the game warden was conducting the checkpoint other than in accordance with established department policy. We apply the presumption that the checkpoint was so established and that official duty has been regularly performed. ORS 41.360(15); Ring v. Patterson, 137 Or. 234, 240, 1 P.2d 1105 (1931).
The evidence shows that the checkpoint was clearly marked, its purpose was plainly evident, and the game warden testified that all approaching vehicles were stopped or slowed. The defendant was stopped pursuant to a practice embodying neutral criteria.

III. Intrusiveness of the Inquiry
Defendant also contends that the scope of the officer's inquiry "was not limited to the immediate circumstances which aroused the officer's suspicion," and that the officer's "subsequent behavior was illegally and unconstitutionally intrusive." We disagree.
The stop of the defendant's car was constitutionally and statutorily permissible. We are aware of no prohibition against an officer asking a driver for an operator's license when a driver is validly stopped, *435 whatever be the reason for the stop. Oregon motorists are required to have a valid operator's license in their possession while operating a car and, upon demand, to show it to any peace officer. ORS 482.040(2)(b).
The defendant claims that the inquiry must relate to the purpose for which the stop was made.[21] Although the officer's request for identification or a driver's license did not directly relate to the purpose of the roadblock, it certainly related to the defendant's status as the driver of the car. We hold that if an automobile is validly stopped by a law enforcement officer, the officer may request the operator's driver's license.
Regarding the alternative request for "identification," that, too, is a reasonable request, for if the operator had no license the officer would be entitled to know the identity of the driver.
One further point requires discussion. The police officer testified as follows regarding his purpose in asking for identification or a driver's license:
"Q. Officer, when she stopped, why did you ask her for her driver's license or her identification?
"A. Well, lots of times on our `paperman' if he has difficulties locating people on serving papers on warrants or something they give us a list of names and this way, not knowing for certain when a person comes up whether they have been hunting or not, if it appears they haven't we ask for identification and possibly we will see a name familiar to us from looking at that list so maybe it is somebody they are looking for that they have a warrant on or something."
We have no doubt that a roadblock created for the sole purpose of "locating people [on whom could be served] papers or warrants" is impermissible, absent evidence that there existed a substantial likelihood of success in locating such persons. Such evidence is absent here.
We do not look at the subjective good faith of the officer in considering the reasonableness of searches and seizures. Neither do we suppress evidence otherwise properly obtained because of an improper motive of the police officer. State v. Carter/Dawson, 287 Or. 479, 485, 600 P.2d 873 (1979); State v. Tucker, 286 Or. 485, 493, 595 P.2d 1364 (1979).
Ours is not a society where police can stop any citizen and require the production of an "identification card" without reason. But our society is one in which police have law enforcement responsibilities-responsibilities which bring them into contact with motorists in numerous ways and for many necessary purposes. Considering these law enforcement needs, the expectation of privacy one has in operating a car, and the minimum intrusion of a request for an operator's license, we see no violation of either the federal or state constitution under the facts of this case.
Affirmed.
LINDE, J., filed a dissenting opinion.
LINDE, Justice, dissenting.
In order to sustain the conviction in this case, the court is prepared to decide that an Oregon state police officer may stop motorists at a temporary "checkpoint" set up at his own discretion in order to investigate whether they perhaps have committed a criminal offense, without either probable cause or grounds for suspicion that any occupant of the vehicle has done so. This *436 result is rationalized by a faulty analysis of the governing constitutional law and, in consequence, of Oregon law. The rationalization has far-reaching implications which will set the courts, and thus those who must advise law enforcement officers, on a future course of illogical, purely ad hoc distinctions.
I cannot agree that the majority opinion is a correct statement of the law. This dissent will show, first, the errors in the majority's purported application of the fourth amendment, and second, its consequent misstatement of Oregon law.

I. The issues.

Certain postulates are not in dispute. It is common ground between the majority opinion and this dissent that the question of state law governing this case is antecedent to the question whether defendant was "seized" in violation of the federal fourth and fourteenth amendments. As recent decisions of this court have repeatedly held, a court's obligation in a case that involves potential statutory and constitutional challenges to governmental action is to determine, first, whether the action is authorized by law; second, whether it is limited by the same or another law; third, whether it is limited by the state constitution and, if the action passes these tests, whether it contravenes the federal Constitution. See State v. Scharf, 288 Or. 451, 454-455, 605 P.2d 690 (1980), and cases there cited; Jarvill v. City of Eugene, 289 Or. 157, 168-171, 613 P.2d 1 (1980). What is meant is a logical, not a temporal, sequence of analysis, for constitutional limits sometimes bear on deciding what authority the lawmaker meant to assert. See e.g. State v. Smyth, 286 Or. 293, 296, 593 P.2d 1166 (1979); Carden v. Johnson, 282 Or. 169, 177, 577 P.2d 513 (1978); Oregon Medical Association v. Rawls, 281 Or. 293, 300, 574 P.2d 1103 (1978) (and cases cited therein); Tharalson v. State Dept. of Revenue, 281 Or. 9, 13, 573 P.2d 298 (1978); State v. Jackson, 224 Or. 337, 345, 356 P.2d 495 (1960); City of Portland v. Welch, 229 Or. 308, 316, 364 P.2d 1009, modified and reh. den. 229 Or. 316, 318, 367 P.2d 403 (1961).[1]
There is, however, substantial disagreement over the constitutional limits within which Oregon law is designed to be administered. The majority opinion attempts to show that the stop in this case, if authorized, would not violate the fourth amendment; it then implicitly assumes that the stop fell within the ordinary law enforcement authority of the state police officer. I believe that the majority misconstrues and unjustifiably expands the exceptions to the requirement of strict "probable cause" under the fourth amendment, and that consistent with constitutional limits Oregon law restricts stops for purposes of investigating past criminal conduct to circumstances in which an officer "reasonably suspects that a person has committed a crime." ORS 131.615.
It also is undisputed that the officer's order to stop and the temporary detention of defendant and her car were a "seizure" within the constitutional meaning of that word. The majority holds that such a seizure without any individualized grounds is permissible in order to inquire into possible past criminal conduct as long as it is conducted at a stationary checkpoint, and this even when the checkpoint is set up at the discretion of an officer in the field unconfined either by a systematic administrative scheme or by prior judicial approval. I believe, to the contrary, that a "checkpoint" exception from the constitutional requirement of individualized grounds for a warrantless seizure has been recognized only in the context of "regulatory" programs, that is to say, programs designed to accomplish a preventive or corrective aim rather than inquiry into past criminal acts and conducted *437 in conformity with known and systematic administrative authorization rather than at the discretion of police officers.
Oregon law, properly construed, remains within the constitutional bounds, as I shall show. But after the majority's opinion it does not. The issue is not whether the state could design a valid program of systematic inquiries in the course of administering its resources of fish and game. But the record before us does not show that the stop was made under any such program. The error lies in attempting nevertheless to sustain this seizure, at the price of hazardous implications that the majority does not and logically cannot confine to offenses under the game laws. Because the premises of the decision are important beyond its facts, they need to be examined with care.

II. The court's misinterpretation of federal law.

Concentrating its attention on the issue of federal more than that of Oregon law, the majority opinion seeks support for its result in selected quotations from United States Supreme Court opinions in rather different cases. One sequence of four cases involved the efforts of officers of the United States Immigration and Naturalization Service to prevent aliens from entering or remaining in this country illegally. Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973); United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); United States v. Ortiz, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975); United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). Another case concerned a state police officer's stop of an otherwise unsuspected driver in order to check his driver's license and the vehicle's registration. Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). But these precedents do not support the validity of the stop in the present case.
First and most obviously, the cited precedents do not support the present holding, since the government lost in every case except United States v. Martinez-Fuerte. In each of the others the Supreme Court found a violation of the fourth amendment. Thus, far from relying on these precedents, the majority is reduced to distinguishing them and searching out language that it believes would allow a contrary result here. It gets sidetracked into distinctions between searches and stops and why a warrant may be required for one and not the other, none of which is at issue here. And Martinez-Fuerte, which sustained a stop, also is more obstacle than help to the majority, for there the Supreme Court stressed that the stop was valid only because the checkpoint was permanent and was conducted under prescribed agency rules rather than at the discretion of a field officer.
In Martinez-Fuerte the Supreme Court pointed out that the border control checkpoint had been operated at the same location (San Clemente, California) for 24 years, and it expressly confined its holding to "permanent checkpoints." 428 U.S. at 566, n. 19, 96 S.Ct. at 3086, n. 19. A chief reason was that such checkpoints involve less discretionary enforcement activity. "The location of a fixed checkpoint is not chosen by officers in the field, but by officials responsible for making overall decisions as to the most effective allocation of limited enforcement resources." 428 U.S. at 559, 96 S.Ct. at 3083. These officials' discretion is exercised in accordance with applicable statutes and regulations. Id. at note 13. Again, the Court rejected defendant's argument that Border Patrol seizures required some kind of prior judicial scrutiny on the ground that "the need for this is reduced when the decision to `seize' is not entirely in the hands of the officer in the field, and deference is to be given to the administrative decisions of higher ranking officials." 428 U.S. at 566.
This emphasis on the permanence and fixed, nondiscretionary conduct of checkpoints shows that Martinez-Fuerte demands the opposite result on the present facts even if its evaluation of stops without individualized grounds were otherwise applicable. But my disagreement with the majority is not only over such details as the degree to which the officer's checkpoint *438 was "fixed" or "roving," although this alone would be decisive. Beyond this, I believe the majority errs in transferring that evaluation from the context in which the Supreme Court developed it the context of inspections for preventive or corrective purposes to the different and wider context of seizures aiming at the discovery and punishment of past offenses. No Supreme Court decision applies the "border search" analogy in that wider context, and if this were to happen, I would not import it into Oregon's law of search and seizure.
The rules governing the validity of stopping vehicles for regulatory inquiries or inspections have evolved from one of two lines of decisions that reduced the "probable cause" requirement under the fourth amendment. As I have said, it is undisputed that the stop in this case was a "seizure" within the constitutional meaning of the word. Cf. United States v. Martinez-Fuerte, supra, 428 U.S. at 556, 96 S.Ct. at 3082. Ordinarily a person or property may be seized only upon evidence providing probable cause to do so under a criminal statute or other law that the officer purports to enforce. Two distinct lines of decisions, however, treat some kinds of searches and seizures as not "unreasonable" in circumstances short of the strict requirement of probable cause.
One line is derived from Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). It arose from the need to stake out constitutional contours for street encounters between police officers and persons who for some reason aroused an officer's suspicion without giving rise to probable cause for an arrest. In this context, the Court declined to find a violation of the fourth amendment in a brief detention at the site of the encounter accompanied by a limited pat-down for weapons if the officer reasonably suspects the person to be armed. While these original decisions focused on the legality of the search rather than the initial stop, they were understood to imply that the stop and temporary detention themselves, if compelled by a show of authority, must also be based upon some reasonable grounds for suspicion and investigation. Cf. Adams v. Williams, 407 U.S. 143, 145-146, 92 S.Ct. 1921, 1922, 32 L.Ed.2d 612 (1972). The Terry rationale for reasonable police conduct in brief, unplanned, individualized encounters under circumstances raising a suspicion of criminal conduct does not reach systematic, general or random stops for investigation.
Nothing in Terry or the cases that follow it gives any credibility to the notion that without any grounds of suspicion persons can be stopped and questioned in order to discover whether they have committed a past criminal offense, if only the stop and questioning is conducted at a "checkpoint." Yet that is what the majority countenances in this case.
Contemporaneously with Terry v. Ohio, supra, another line of decisions began to reduce the strict requirements of probable cause for so-called administrative or "regulatory" inquiries. These began with the requirements for obtaining access to premises for housing code and safety inspections of conditions on the premises. Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); Marshall v. Barlow's, Inc., 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978). A variation dealt with regulatory agency inspections of certain intensively regulated businesses such as dealers in liquor, Colonnade Catering Corp. v. United States, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970), and firearms, United States v. Biswell, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972). Insofar as we deal here with the seizure of a person rather than with premises, we do not face the question of search warrants at issue in those cases. Rather, their relevance for understanding the later vehicle cases lies in the importance the Supreme Court attached, first, to the difference between regulatory and penal objectives of the inquiry and second, to the nondiscretionary, statutory and administrative regularity of the inspection procedure.
*439 These two themes were prominent in Camara, in which the Court required that "reasonable legislative or administrative standards for conducting an area inspection are satisfied," after taking pains to state that the administrative inspections were needed for preventive purposes and disclaiming any change in the fourth amendment standard for investigations of crime. 387 U.S. 535, 537-538, 87 S.Ct. 1734, 1735. They were reaffirmed as recently as Marshall v. Barlow's, Inc., supra, when the Court spoke of probable cause, not "in the criminal law sense," but in the sense of adherence to the "reasonable legislative or administrative standards" demanded in Camara. 436 U.S. at 320, 98 S.Ct. at 1824. The Court's distinction again made it clear, if it needed to be made clear, that this reduced standard of probable cause under the fourth amendment referred to legislatively authorized and carefully circumscribed programs of administrative inquiry into existing conditions for the purpose of correcting the condition itself. It would not allow either an agency or a magistrate to authorize dragnet methods of unconsented searches or seizures to discover, for example, whether anyone in the targeted area or population had stolen property, or used marijuana, or engaged in prostitution. Without that distinction between preventive or corrective administration and "catching criminals"-law enforcement in the "criminal law sense"-nothing would remain of the need for individualized grounds for suspicion that the Supreme Court has maintained from Terry v. Ohio, supra, to this year's Reid v. Georgia, ___ U.S. ___, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980), whenever the dragnet is systematic enough. Of course the Supreme Court has held no such thing. But there is serious reason for concern when a majority of this court can believe that the Supreme Court's analysis of regulatory inspections extends to such criminal law enforcement.
The majority appears to believe that the Supreme Court's distinction applies only to searches. There is no basis for this. The same fourth amendment refers to "searches and seizures" in a single, consecutive phrase. The differences between entering stationary premises and stopping a moving person, in or outside a vehicle, are relevant to the reasonableness of proceeding without a prior warrant. That is not at issue here. And insofar as a brief stop and inquiry is less "intrusive" (in the Court's current word) than an entry or a search, the factual basis that can constitute "probable cause" may be less. But the majority confuses these differences with the distinction between regulatory and penal law enforcement. By denying that the distinction applies to stops, it holds in effect that ordinary criminal investigation may "seize" a person without any individualized grounds whatever, as long as this is done at a stationary "checkpoint."
Neither United States v. Martinez-Fuerte nor Delaware v. Prouse lends support to that conclusion. Contrary to the majority's assumption, these as well as earlier decisions apply the theory of regulatory inspections in contexts other than the search of premises. The Border Patrol cases emerged from the longstanding practices of immigration officials (like those of customs officials) in preventing the unlawful entry of persons or goods into the United States. These practices created problems requiring resolution by the Supreme Court when they moved from the border or port of entry to locations well within the United States. But their aim and their constitutional justification remain what they are at the border: the actual exclusion or expulsion of the unlawful entrant or goods. Cf. United States v. Ramsey, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977) (sustaining authority to search letter from abroad reasonably suspected to contain contraband). If the object of a stop were not the discovery and expulsion of unlawful entrants or goods themselves but, rather, the discovery of evidence of past smuggling operations simply for purposes of criminal prosecution, the stop could not be justified under the Border Patrol cases even if it were conducted at a permanent "checkpoint."
*440 The same is true of the checks for driver's licenses and vehicle registrations in Delaware v. Prouse. Possession of a valid license and vehicle registration are a state's regulatory requirements for driving on the public highways. They are checked in order to determine whether the vehicle and driver are qualified to be on the road then and there, much like inspections of safety equipment such as lights or brakes. If the object were to inquire into past offenses for possible prosecution-whether a driver previously had driven a car before the effective date of her license or while its headlights were inoperative, let alone whether she had bought gasoline with an invalid credit card or shot a doe-then the stop would not be saved by being conducted at a stationary checkpoint.
In sum, the majority is misled by its preoccupation with the stationary or mobile character of the police officer's checkpoint into disregarding the context in which the Supreme Court has made that a relevant question. It became relevant in the context of the administrative inspection of drivers and vehicles for regulatory purposes. Besides the administration of customs and immigration regulations and vehicle and drivers' license laws, these include such familiar examples as obligatory stops at truck weight scales or agricultural inspections. Cf. Stephenson v. Department of Agriculture & Consumer Services, 342 So.2d 60 (Fla. 1976), appeal dismissed 434 U.S. 803, 98 S.Ct. 32, 54 L.Ed.2d 61, reh. den. 434 U.S. 960, 98 S.Ct. 493, 54 L.Ed.2d 321 (1977). It is not relevant to law enforcement stops which are made on individualized probable cause (even when reduced to reasonable suspicion) to suspect a person of an offense. Such stops may be made on the move as much as at stationary checkpoints, as the Terry v. Ohio line of cases shows. If the law were as the majority conceives it, the way to stop and investigate air travelers for possible drug offenses, as in Reid v. Georgia, supra, would be simply to set up a stationary checkpoint at airport exits. But this obviously is a very different thing from the preventive checkpoints administered at boarding points in order to exclude dangerous persons or items from the airplane.
The distinction between preventive or corrective administration and criminal investigation thus is the first step in the analysis, before a question of characterizing the "checkpoint" arises. The Supreme Court has not confined the distinction to the inspection of buildings, as the majority thinks, and there would be little sense in that. Housing and business premises are checked for unsafe conditions in order to correct them; so are trucks and automobiles, airplanes, or vessels, as well as the qualifications of their operators; and the object of border searches for unlawful entrants or contraband is to exclude them. It is not primarily to inflict punishment for harm already done. Although violations may carry potential criminal penalties, the compelled inspection is "administrative" or "regulatory" only when these possible penal consequences are incidental and secondary to a program designed to prevent or correct the harmful condition itself.
The Border Patrol cases and Delaware v. Prouse have correctly been categorized as regulatory inspection cases. Chapter 10 of Professor LaFave's Treatise on Search and Seizure is entitled: "Inspections and Regulatory Searches." Section 10.5 begins: "The concern in this section is with yet another variety of administrative searches, the so-called border search." 3 LaFave, Search and Seizure 275. Likewise the treatise places Delaware v. Prouse under the administration of "Vehicle Use Regulations," as distinguished from roadblocks for criminal investigation, which are analyzed in conjunction with Terry v. Ohio and its progeny in chapter 9. 3 LaFave, Search and Seizure 140-141, (1978 and Supp. 27-34, 1980).[2]

III. Fallacies of the court's "balancing."

The majority believes that it can escape the burdens of rigorous analysis by simply *441 invoking the magic term "balancing." The "balancing" that follows may perhaps say something about the adequacy of that contemporary formula as a guide to courts that are called upon to translate constitutional law into operational rules.
The majority's "balancing" is perfunctory, compressed into two brief paragraphs. The first states that a great many people buy hunting and fishing licenses in this state, that much of the state consists of public land, and that game law enforcement is a difficult task. The paragraph continues that the time and location of the stop was "where hunting activity was to be expected" and thus a method likely to be effective "to meet its goals." The second paragraph concedes that the stop was not shown to be governed by any regulations or policies other than the officer's own discretion but disregards this because the roadblock stopped or slowed every motorist "sufficiently for the policeman to make a decision as to whether a further inquiry was called for." These brief propositions then lead the majority without more to "conclude that the governmental interest in the enforcement of laws for the preservation of wildlife in this state is sufficiently substantial to justify the minimal intrusion upon the fourth amendment rights of those stopped for brief questioning and a visual inspection of their vehicles." With regret, I must say that this treatment trivializes the grave task of deciding the constitutional rights of men and women in this state.
First, the majority endorses the effectiveness of the "method" to "meet its goals" without describing the "goals." The record shows that the officer was not engaged in conservation activities, checking licenses or advising potential hunters on their way into hunting areas. He was checking for completed violations of the law, that is to say, for criminal offenses. Of course the ultimate "goal" of many criminal laws is to deter commission of the offense, but that simply puts this case with all other criminal law enforcement stops. Catching offenders for prosecution is not the same kind of goal as excluding or expelling aliens or preserving wildlife while it is still alive.
Second, if the court's "balancing" formula applied to criminal law enforcement stops without individualized grounds, which I deny, the majority offers no evidence that bears either on the nature or magnitude of the harm the roadblock method is supposed to prevent or on its asserted effectiveness. Surely, if the court paid its own formula the respect of taking it seriously, one would expect some attempt to discuss the relevance of the cited number of hunting licenses. How many purchasers of these licenses kill game illegally? Is much of the state's enforcement effort directed at hunting which is illegal only for failure to buy a license, i.e. to a financial concern? What is the magnitude of losses of game from unlawful hunting in relation to the total stock?
Similarly, how many persons are "seized" by police officers in pursuit of game law violations? How many of these stops produce proof of a violation? A deep and obvious gap in the majority's unsupported assumption of "effectiveness" is that the opinion does not explain what an inquiring officer can do if a person not otherwise under suspicion declines to answer the officer's question, or responds that he has shot nothing and drives on. The court does not say that the officer may insist on looking into the trunk or back end of a closed vehicle, and for good reason, since that is a search. Nor does the opinion explain how his mere question is so effective as to justify the stop, since such an evaluation must assume a citizen who acts on his rights, not the effectiveness of counting on the citizen's ignorance.
Obviously evidence bearing on these matters would be crucial if the majority's "balancing" were more than the prescribed label for the conclusion itself. But the majority does not believe that the Supreme Court's "balancing" formula really requires attention to such questions. The opinion offers no evidence concerning them, and there is none in the record.
The easiest and most common fallacy in "balancing" is to place on one side the entire, *442 cumulated "interest" represented by the state's policy and compare it with one individual's interest in freedom from the specific intrusion on the other side, as the majority does here. What balance is likely to be struck between the momentary inconvenience of one person stopped to answer a question and the protection of thousands of the public's deer? Yet it is plain that to "balance" one person's rights with cumulated majoritarian interests in this fashion flies in the face of the premise of constitutionally guaranteed individual rights against the state. The semantic "balance" looks different when it matches the freedom of thousands of citizens from being stopped and questioned by police officers against the chance that one or a few will admit to a hunting or fishing violation.
Third, the majority's approach is unworkable because it purports to strike the "balance" ad hoc, limited to the particular police stop on the date and at the location in this case. It does not and cannot provide rules for the legality of police stops at other locations and different times. Would a "game checkpoint" be legal on a highway leading into a town from a hunting area, or on a day toward the end of the season (or out of season)? But the purpose of legal rules, and particularly constitutional rules, is to govern official conduct toward the vast majority of citizens against whom no evidence is obtained, not to provide a defense for the few who end up in court. This again shows that the majority has misunderstood the Supreme Court's use of "balancing" in testing systems of administrative inquiry, not individual police roadblocks.
At bottom, the majority's "balancing" is perfunctory because it simply attaches no weight to the "seizure" represented by a roadblock stop and questioning. But on its own terms, that view proves too much. If that method may be used to stop persons without individualized grounds to suspect them of violating the game laws, why not for investigation of more serious criminal offenses, for instance under the drug laws? Surely not because the state's interest is less. Again, the majority's fallacy lies in its refusal to distinguish between criminal law enforcement, as in this case, and the Supreme Court's fourth amendment analysis of systematic regulatory programs. I therefore return to that analysis.

IV. The requirement of nondiscretionary administration.

The Supreme Court's acceptance or rejection of relaxed standards for unconsented entries, stops, or inspections in true administrative programs has emphasized a particular concern and its corresponding safeguards. The concern is that the decision whether, how, and whom to investigate not be left to the discretion of the officer in the field. The corresponding safeguards, beyond the requirement of legislative prescription of the program, are administrative regularity in its execution or prior approval by a magistrate.
The Supreme Court's approach does not assume that officers are empowered in the pursuit of their duties to conduct any search or seizure not forbidden by the fourth amendment. To the contrary, its examination of the various business inspection programs, the Border Patrol stops of automobiles, and the mail search in United States v. Ramsey, supra, scrutinizes the statutory authorization of the officers' actions preliminary to reaching a constitutional issue, though the statutory authority of course cannot exceed constitutional bounds.[3] Thus, in Colonnade Catering Corp., supra, the Court ordered suppression *443 of evidence seized by an unconsented search because the officers lacked statutory authority, even though their actions, if authorized, would not have violated the fourth amendment.
The mere fact of statutory authorization is not enough. The question is whether the law or deliberate agency policies promulgated under it give reasonable direction and limits to the investigatory power or leave that power at large in the hands of individual officers. Thus the Supreme Court wrote in explanation of a warrant requirement in Camara v. Municipal Court:
"[W]hen the inspector demands entry, the occupant has no way of knowing whether enforcement of the municipal code involved requires inspection of his premises, no way of knowing the lawful limits of the inspector's power to search, and no way of knowing whether the inspector himself is acting under proper authorization ... The practical effect of this system is to leave the occupant subject to the discretion of the official in the field...."
387 U.S. at 532, 87 S.Ct. at 1732. With the occupant's right to demand a warrant, "the decision to enter and inspect will not be the product of the unreviewed discretion of the enforcement officer in the field." See City of Seattle, 387 U.S. at 545, 87 S.Ct. at 1740. In United States v. Ortiz, supra, the Court was "not persuaded that the checkpoint limits to any meaningful extent the officer's discretion to select cars for search.... This degree of discretion to search private automobiles is not consistent with the Fourth Amendment." 422 U.S. at 896, 95 S.Ct. at 2588. By contrast, in United States v. Martinez-Fuerte, the Court noted that "[t]he location of a fixed checkpoint is not chosen by officers in the field, but by officials responsible for making overall decisions as to the most effective allocation of limited enforcement resources," and that this discretion of Border Patrol officials would be exercised in accordance with applicable statutes and regulations. 428 U.S. at 559 and n. 13, 96 S.Ct. at 3083 and n. 13. And most recently, in Delaware v. Prouse:
"The marginal contribution to roadway safety possibly resulting from a system of spot checks cannot justify subjecting every occupant of every vehicle on the roads to a seizure-limited in magnitude compared to other intrusions but nonetheless constitutionally cognizable-at the unbridled discretion of law enforcement officials. To insist neither upon an appropriate factual basis for suspicion directed at a particular automobile nor upon some other substantial and objective standard or rule to govern the exercise of discretion `would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches....' Terry v. Ohio ..."
The Court continued:
"This kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent.... [Apart from the cases involving closely regulated business enterprises] regulatory inspections unaccompanied by any quantum of individualized, articulable suspicion must be undertaken pursuant to previously specified `neutral criteria.' Marshall v. Barlow's, Inc. ..."
Delaware v. Prouse, 440 U.S. at 661-662, 99 S.Ct. at 1400. The Court went on to suggest that a state could develop other methods to check vehicles or drivers, possibly including stops at roadblocks, "that do not involve the unconstrained exercise of discretion." 440 U.S. at 663, 99 S.Ct. at 1401. Again, it must be remembered that the state's concern in the Delaware case was to police the qualifications of vehicles and drivers to be on the road at all, not with the occupants' prior or current compliance with unrelated laws, just as in the border search cases the concern was with the exclusion or expulsion of persons or goods whose very presence was the condition to be prevented or corrected, not with dragnet stops to discover *444 perpetrators of previously committed or unrelated crimes.[4]

V. The importance of a systematic program.

It may be questioned why it should matter whether a person is subjected to a temporary detention, inquisition, or search in pursuit of a systematic program promulgated by responsible agency officials or at the discretion of individual law enforcement officers in the field. This may, indeed, seem immaterial when such an action is viewed only from the perspective of the single individual ensnared in one particular instance. It is, however, an important element of the exception under which this and similar stops without any particularized suspicion are sought to be justified.
The guarantees of the fourth amendment and Oregon's article I, section 9, have a broad role as institutional and procedural safeguards in shaping the conduct of governmental officers before the fact, of which their role as a shield for the defendants prosecuted on illegally seized evidence is only the consequence. See Amsterdam, Perspectives on the Fourth Amendment, 58 Minn.L.Rev. 349, 367-369, 416-417 (1974); Bacigal, Some Observations and Proposals on the Nature of the Fourth Amendment, 46 Geo.Wash.L.Rev. 529 (1978). The security and freedom from unwarranted official impositions that the search and seizure clauses guarantee is that of "the people," of men and women going about their everyday business, not only or primarily the interests of criminal suspects. Thus officers may undertake "searches" or "seizures" without consent only upon "probable cause" in some form, either found to be so in advance by a magistrate or, if urgency makes this impossible, then such as a magistrate properly would approve if presented to him. Any kind of unconsented inspection without individual probable cause represents an exception to the general rule.
The exception for so-called "administrative" or "regulatory" entries or stops for inspection without any grounds for individualized suspicion depends on the premise that the particular practice is indispensable in order to prevent or correct a specified harmful condition, and that "probable cause" for expecting to find instances of that condition by systematic means exists in the mass when probable cause does not exist with respect to any single instance. Unless this premise fits the challenged action, the exception for a "generalized" form of probable cause developed in the line of decisions from Camara v. Municipal Court to Delaware v. Prouse does not apply.
Thus it is in the nature of this exception that both of its aspects depend upon a generalized or program-wide assessment. To the extent that the Supreme Court's fourth amendment rule calls for the state's assertion of an exceptionally important public interest in the preventive or corrective administration of the program, this assessment necessarily belongs in the first instance to the responsible legislative and executive officials, not the individual officer. The same is true of assessing the probability that a proposed form of systematic inspection will produce a significant percentage of instances of the condition to be prevented or corrected, and that it is essential in order to accomplish this purpose. Again, these are judgments that can only be made on a program-wide basis, not ad hoc by field officers. And only legislative or agency-wide rules or a magistrate's warrant can confine the purposes, times, places, manner, and targets of "administrative" inspections to those justified by the foregoing assessment. By contrast, when an unconsented entry or stop and investigation is undertaken by an officer against a person and in a place, time, or manner selected in his own discretion, though in the best of faith, it is indistinguishable from the stops without any articulable basis for individualized suspicion that remain forbidden to law enforcement *445 officers even under Terry v. Ohio, supra.[5]
The foregoing describes relevant parts of the fourth amendment framework within which the Oregon law governing this case must be examined. It is evident that the question is not whether one or another kind of stop or search may be made under a state's "game laws" any more than, for instance, under its "drug laws" or its "traffic laws." Instead, the initial inquiry must be into the source and purpose of the authorization for the investigatory action, the standards prescribed to confine discretion in administering this authority, the level of official accountability at which discretion is exercised, and the degree of ad hoc improvisation or compliance with a prescribed, systematic program that led the officer to take the challenged action.

VI. The stop and the Oregon statutes.

When evidence for a prosecution is discovered as a result of a warrantless seizure, a motion to suppress calls upon the prosecution to show that the seizure was lawful or that the evidence would have been discovered irrespective of the seizure. ORS 133.673-ORS 133.693.[6]Cf. State v. Warner, 284 Or. 147, 160-161, 585 P.2d 681 (1978); State v. Groda, 285 Or. 321, 331, 591 P.2d 1354 (1979) (concurring opinion); cf. State v. Wilson, 31 Or. App. 783, 787, 571 P.2d 554 (1977); State v. Downes, 19 Or. App. 401, 404-405, 528 P.2d 110 (1974). Since the state here does not make the latter claim, it must demonstrate the lawfulness of Miss Tourtillott's initial stop, or "seizure," by the state police officer.
The record contains very little that would show whether this stop was conducted under the kind of administrative program and constraints outlined above. This is not surprising in a local prosecution of a traffic offense, given the novel and unsettled character of the issues, but it confines the state's case within the limitations of this record and of judicial notice. Cf. State v. *446 Warner, supra, 284 Or. at 159, 161, 585 P.2d 681.
The only witness called for the state was the arresting police officer. He testified that he was manning a "game check station" that had been established on a rural highway by placing in the middle of the road a yellow sign with the message "Attention hunters ... all vehicles must stop." His purpose was to "check hunters" for "anything basically to do with hunting violations." He testified that besides himself, there was a fish and wildlife department employee nearby who was there "to gather statistics, to see the hunters' success." Miss Tourtillott obeyed the instruction on the sign. The officer then asked for her driver's license, and she admitted that her license was suspended.
This record falls far short of explaining the salient characteristics that might give legal validity to operating a "game check station." It does not elucidate under whose direction the officer was acting, who made the determination that a game check station should be established at that time and place, or perhaps at a number of places, and for how long, nor the scope or limits of the assignment given those who were to conduct the check. To the extent that one may draw any inferences from the brief testimony, they seem to be that the checkpoint was temporary and mobile, and that its location, duration, and manner of operation were left to the personnel in the field. From the officer's statements that he was looking for hunting "violations" and the nearby agency employee was collecting statistics of the hunters' "success," it may also be possible to infer that the check was directed at persons who appeared to have been hunting rather than at those who appeared about to go hunting.[7] It is difficult to treat a generalized stop of hunters on the way out of the woods or fields in order to check for poaching or other game law violations as an "administrative" stop for preventive rather than criminal law enforcement purposes, since it comes too late to save the game. The inspections under the housing code in Camara, the immigration checkpoints in Martinez-Fuerte, and the license and registration checks in Delaware v. Prouse would be somewhat more plausible analogies for a program directed at checking the hunting licenses of persons apparently headed toward hunting areas than of those leaving them.[8]
The parties invoke different statutory law as governing the stop in this case. Defendant relies on ORS 131.615, which provides:
"(1) A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that he is a peace officer, make a reasonable inquiry.
"(2) The detention and inquiry shall be conducted in the vicinity of the stop and for no longer than a reasonable time.
"(3) The inquiry shall be considered reasonable only if limited to the immediate circumstances that aroused the officer's suspicion."
The state concedes that if this statute applies, the officer did not have reasonable suspicion that defendant had committed any offense when he stopped her car. However, the state contends that the requirements of ORS 131.615 do not apply to "checkpoint stops" authorized under another law, and it claims that authority to operate "game violation checkpoints" may be inferred from the wildlife laws, ORS chapter 496. To this, defendant responds that even if such a source of authority might theoretically exist, the state has not shown that the officer acted under a properly authorized *447 program for "administrative" purposes and including the requisite safeguards, and that therefore the stop to inquire into possible hunting "violations" must be tested under ORS 131.615. On the record before us, defendant's argument should prevail.
ORS 131.615, supra, is written in terms of authorization. It does not purport to govern all possible stops to the exclusion of any other authorization. It does, however, govern those stops in which the intended inquiry concerns a suspected criminal offense and which cannot be shown to rest on another authorization.
The statutes cited by the state for such an alternative authorization, ORS 496.645, 496.660, and 496.675, do not help it here.[9] These sections deal with warrantless arrests, searches, and seizures directed against suspected violators of the wildlife laws and, to be constitutional, necessarily require compliance with the standards governing such law enforcement actions. But the present defendant was not arrested or searched on suspicion of having violated the law. The officer expressly disclaimed any such suspicion.
This does not mean that the agency responsible for the management of wildlife in this state, the State Department of Fish and Wildlife, ORS 496.080, may not be authorized to develop and operate a properly designed system of administrative checks on the licensed and regulated activities of hunting and fishing for wildlife.[10] ORS 496.138 assigns to the State Fish and Wildlife Commission the authority to formulate the necessary policies and programs, including rules made under the Oregon Administrative Procedure Act.[11] And the department may enforce its rules by the use of peace officers and state police officers as well as its own personnel. ORS 496.605-ORS 496.615. Of course this authority and any rules or enforcement procedures adopted *448 under it must remain, in the words of article I, section 9, a "law" that does not "violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure."
On the record before us, it does not appear that the Department has adopted any administrative system of checkpoints for the purposes of wildlife management, or that the present stop was made pursuant to such a systematic program. Nor does examination of the Oregon Administrative Rules promulgated under ORS chapter 496 disclose any administrative program or policy of which we might take judicial notice. Thus we have here no occasion to test a departmental program of "game check points" against article I, section 9, or the 4th amendment, nor to determine whether the particular program is one that would require the prior approval of a magistrate. The short of it is that this stop was not based on the department's exercise of administrative authority under ORS chapter 496 and therefore cannot be justified as such.
To the contrary, it appears from this record that the stop was made at the discretion of an officer in the field, in order to discover possible violators of the wildlife laws after the fact with a view to criminal prosecution. This does not differ from other law enforcement stops merely because the laws being enforced concern illegal hunting rather than another illegal activity. Unlike an "administrative" stop, such a law enforcement stop, if short of cause for an arrest, is governed by ORS 131.615.
In summary, the state has not demonstrated that defendant was stopped pursuant to a properly authorized administrative program designed for preventive or wildlife management purposes and including the necessary safeguards described in this opinion. Nor was the stop in this case authorized by ORS 131.615 as a law enforcement stop on reasonable suspicion of crime. Since the stop itself was not shown to have been lawful, there is no need to consider defendant's further argument that a stop which might be properly made for the administration of the game laws cannot be used for an inquiry into the driver's licensing laws. Under ORS 133.683, supra, once the stop itself was unjustified, the subsequently discovered evidence of defendant's traffic offense should have been suppressed.
DENECKE, C.J., and LENT, J., join in this dissenting opinion.
NOTES
[1] "Except as provided in subsection (2) of ORS 484.735, it shall be unlawful for any person to operate a motor vehicle in this state while the order of the court prohibiting such operation remains in effect. A person who violates this section commits a Class C felony." ORS 484.740.
[2] ORS 496.610 provides:

"(1) The Department of State Police shall employ a sufficient number of state police to enforce the wildlife laws.
"(2) The services and expenses of the Department of State Police incurred in the enforcement of the wildlife laws shall be paid from the State Wildlife Fund.
"(3) The members of the state police assigned to enforce the wildlife laws shall be selected from names suggested by the commission. If the commission fails to submit sufficient qualified nominees for such positions, the Department of State Police shall make its own selections."
[3] Or.Const., Art. I, § 9:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."
Fourth Amendment, U.S. Constitution:
"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."
[4] The defendant has not contended that her stop, if not prohibited by ORS 131.615, was otherwise unauthorized by statute or by rule. We need not determine in this case, therefore, whether the absence of a statute or rule specifically authorizing game checkpoint stops prohibits their use. State v. Skinner, 254 Or. 447, 448-449, 461 P.2d 62 (1969).
[5] A "stop" is a seizure within the meaning of the Fourth Amendment. U.S. v. Martinez-Fuerte, 428 U.S. 543, 556, 96 S.Ct. 3074, 3082, 49 L.Ed.2d 1116 (1976); Terry v. Ohio, 392 U.S. 1, 16-17, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 829 (1968); State v. Tucker, 286 Or. 485, 592, 595 P.2d 1364 (1979).
[6] The "stop and frisk" provisions first appeared in the November 1971 draft.
[7] See also Platt, A Legislative Statement of Warrantless Search Law, 52 Or.L.Rev. 139 (1973).
[8] The commentary to the final draft of the Proposed Oregon Criminal Procedure Code does not indicate a contrary intent. The commentary to section 31 of the draft indicates that the Commission intended to codify the "stop and frisk" law in accord with decisions of the Supreme Courts of the United States and Oregon:

"Subsection (1) proposes a codification of the peace officer's ability to stop a person as close to the Terry [v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 10 L.Ed.2d 889 (1968)] and [State v.] Cloman, [254 Or. 1, 456 P.2d 67 (1969)] rationale as possible while giving the courts leeway to interpret the protean situations that arise and giving the officer limited `stopping' powers."
In State v. Valdez, 277 Or. 621, 561 P.2d 1006 (1977), we stated that "[a]n officer's authority to stop and interrogate a person concerning his possible commission of a crime is covered by ORS 131.615 * * *." Neither Valdez nor Cloman involved a roadblock stop in which all vehicles were stopped absent suspicion that any one car contained evidence of the commission of a crime. In Cloman we specifically noted that we were "not passing upon the right to stop and examine the driver's operating license or the right to stop at a general roadblock." 254 Or. at 6, n. 2, 456 P.2d 67. The question whether the legislature intended to preclude roadblock stops by enacting ORS 131.615 was not before us in those cases.
[9] 33 Oregon Wildlife No. 5, page 3 (May, 1978) (published by the Oregon State Department of Fish and Wildlife).
[10] The 1978 estimated population was 2,472,000 people. Oregon Blue Book 1979-80, p. 6 (published by Secretary of State Norma Paulus).
[11] Id. at 7.
[12] Id. at 6, 197-198.
[13] On the facts of this case, we need not consider whether a game checkpoint located in a metropolitan area might be overly intrusive with respect to "legitimate traffic." See United States v. Martinez-Fuerte, 428 U.S. at 559, 96 S.Ct. at 3083; United States v. Brignoni-Ponce, 422 U.S. at 883, 95 S.Ct. at 2581. This checkpoint clearly was not overly intrusive with respect to legitimate automobile traffic in the area.
[14] This holding is consistent with the result in the only other recent game checkpoint case which has been decided by the highest court of any state. In State v. Halverson, S.D., 277 N.W.2d 723 (1979), the Supreme Court of South Dakota held that a game checkpoint stop did not violate a defendant's Fourth Amendment rights. In Halverson, the defendant was stopped at a roadblock maintained by a state police trooper and four employees of the South Dakota Department of Game, Fish and Parks. Approaching vehicles were stopped by the flashing red lights on the trooper's vehicle, and four other state-owned vehicles were parked at the site. The defendant claimed that evidence of his driving while revoked should be suppressed because it was discovered when he was unconstitutionally forced to stop at the game checkpoint.

The court concluded that under United States v. Martinez-Fuerte there was no constitutional violation. Applying the balancing of interests analysis, the court stated:
"* * * The intrusion into the right of the nonhunter to the uninterrupted use of the highways is slight and greatly outweighed by the public interest in the management and conservation of wildlife in this state.
"* * *.
"We hold that the game check stop did not violate defendant's right against unreasonable seizure. The intrusion was reasonable." 277 N.W.2d at 725.
[15] Three leading cases in this area, Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967), and Marshall v. Barlow's Inc., 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), all involved warrantless searches, of premises. See below, page 432.
[16] See v. City of Seattle, supra, 387 U.S. n. 15 at 546, 87 S.Ct. n. 15 at 1741.
[17] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[18] The dissent views the Border Patrol cases and Prouse as mere extensions of the Camara line of administrative search cases, only applied to motor vehicles. An analysis of the Border Patrol cases indicates that the Justices did not see (or at least did not state) that the cases were mere extensions of Camara.
[19] The dissent does not go so far as to require a warrant. But the cases relied upon (Camara, See, and Marshall) do.
[20] "Since our holding emphasizes the controlling standard of reasonableness, nothing we say today is intended to foreclose prompt inspections, even without a warrant, that the law has traditionally upheld in emergency situations. * * *" Camara, supra, 387 U.S. at 539, 87 S.Ct. at 1736.
[21] The defendant relies on United States v. Martinez-Fuerte, supra, 428 U.S. n. 5 at 566-567, 96 S.Ct. n. 5 at 3086, and United States v. Brignoni-Ponce, supra, 422 U.S. n. 13 at 881, 95 S.Ct. n. 13 at 2580, and ORS 131.615. We reject the defendant's contention that the request for the driver's license or identification was in violation of ORS 131.615. We have already determined that the legislature did not intend ORS 131.615 to be applied to stops based on less than reasonable suspicion of criminal activity. It necessarily follows that the officer was not bound by this statute to limit his inquiry "to the immediate circumstances which aroused the officer's suspicion."
[1] "[T]he proper sequence of analysis is first, whether a particular official action is authorized by law, second, whether it contravenes the Oregon constitution, and only then whether it satisfies the fourteenth amendment; for when a state in fact protects a person's asserted rights under its law, there can be no question of violating the fourteenth amendment."

State v. Greene, 285 Or. 337, 349, 591 P.2d 1362 (1979) (concurring opinion).
[2] See also 1 K.C. Davis, Administrative Law Treatise 262 (2d ed. 1978), "Automobiles Near Border." The Davis treatise does not deal with criminal law enforcement. But the Border Patrol cases are administrative law.
[3] "It is clear, of course, that no Act of Congress can authorize a violation of the Constitution. But under familiar principles of constitutional adjudication, our duty is to construe the statute, if possible, in a manner consistent with the Fourth Amendment...."

Almeida-Sanchez v. United States, 413 U.S. at 272, 93 S.Ct. at 2539.
We recently held that a police officer must stay within his authority when he purports to enforce the wildlife laws, without regard to any constitutional violation. Dickens v. DeBolt, 288 Or. 3, 602 P.2d 246 (1979).
[4] See, e.g., United States v. Brignoni-Ponce, 422 U.S. at 883 n. 8, 95 S.Ct. at 2581 n. 8. Thus the Supreme Court has also noted with respect to the "administrative" stops by the Border Patrol that these were conducted by specialized personnel not concerned with general law enforcement.
[5] Professor W.R. LaFave has written about the importance of systematic rather than ad hoc rules under the fourth amendment:

"... Fourth Amendment doctrine, given force and effect by the exclusionary rule, is primarily intended to regulate the police in their day-to-day activities and thus ought to be expressed in terms that are readily applicable by the police in the context of the law enforcement activities in which they are necessarily engaged. A highly sophisticated set of rules, qualified by all sorts of ifs, ands, and buts and requiring the drawing of subtle nuances and hairline distinctions, may be the sort of heady stuff upon which the facile minds of lawyers and judges eagerly feed, but they may be `literally impossible of application by the officer in the field.'
"If the rules are impossible of application by the police, the result may be the sustaining of motions to suppress on Fourth Amendment grounds with some regularity, but this can hardly be taken as proof that `the people' are `secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' Rather, that security can only be realized if the police are acting under a set of rules which, in most instances, makes it possible to reach a correct determination beforehand as to whether an invasion of privacy is justified in the interest of law enforcement....
"[A contrary effect can be avoided only] if certain search and seizure rules are expressed in terms of `standardized procedures' or a `set routine,' that is, if there are some rules which `will be applied to all cases of [a certain] type, regardless of particular factual variations,' in lieu of more sophisticated but less precise rules requiring ad hoc decision making by both police and courts. Such an approach seems particularly appropriate for those forms of police action which involve relatively minor intrusions into privacy, occur with great frequency, and virtually defy on-the-spot rationalization on the basis of the unique facts of the individual case."
LaFave, "Case-by-Case Adjudication" Versus "Standardized Procedures": The Robinson Dilemma, 1974 S.Ct.Rev. 127, 141-143.
[6] ORS 133.673 provides that objections to the evidentiary use of illegally seized "things" shall be made by motion to suppress in advance of trial. ORS 133.693(4) provides that on a motion to suppress "evidence seized as the result of a warrantless search," the prosecution has the burden to prove the validity of the search. ORS 133.683 extends suppression to evidence discovered as a result of a search or seizure that would lead to the suppression of "things," unless the prosecution shows that it would have discovered the evidence anyway. When a warrantless seizure results in the discovery of nonphysical evidence that would not otherwise have been discovered, the prosecution burden to justify the initial seizure follows from the combination of ORS 133.683 and 133.693(4).
[7] The officer testified that some cars whose occupants plainly seemed not to be hunters were waved on without inquiry.
[8] We need not in this case decide whether gathering fish or game statistics alone could be a sufficient reason to conduct a general checkpoint stop of vehicles under a properly confined program. An agency employee engaged in that function might not turn his attention from game statistics to the enforcement of the traffic laws or the search for persons to be served with unrelated warrants or summonses, as the police officer did in this case. Cf. note 4, supra.
[9] ORS 496.645:

"Any person authorized to enforce the wildlife laws may, without warrant, arrest any person violating any of the wildlife laws, and take the person before any court having jurisdiction of the offense. The court shall proceed without delay to hear, try and determine the matter and enter judgment according to allegations and proofs."
ORS 496.660:
"(1) Any person mentioned in ORS 496.645 may search any person, and examine any boat, automobile, aircraft, conveyance, vehicle, game bag, game coat or other receptacle for wildlife, or cold storage rooms, warehouses, taverns, boarding houses, restaurants, club rooms, outhouses, saloons, depots, hotels and all other places, except private dwelling houses, wherein wildlife may be kept or sold, and examine all packages and boxes held either for storage or shipment which they have reason to believe contain evidence of violations of the wildlife laws.
"(2) Any hindrance or interference to such search is prima facie evidence of a violation of law by parties who hindered or interfered, or attempted to hinder or interfere, in the search or examination.
"(3) If upon diligent search or inquiry or both, the person can discover evidence sufficient in his judgment to secure a conviction, or if the person has cause to believe he has sufficient evidence to justify it, he shall at once institute proceedings against the alleged offenders."
ORS 496.675:
"The persons mentioned in ORS 496.645 may at any time, without warrant, seize and take possession of:
"(1) Any wildlife which as been caught, taken or killed, or had in possession or under control, which have been killed, had in possession or shipped, at any time, in any manner or for any purpose contrary to the wildlife laws.
"(2) Any guns, boats, fishing or other apparatus used for the purpose of hunting or fishing, at any time, in any manner or for any purpose contrary to the wildlife laws."
[10] ORS 496.004 defines wildlife:

"(12) `Wildlife' means game fish, wild birds, amphibians, reptiles and wild mammals except whales and porpoises."
The department includes the State Fish and Wildlife Commission, the State Fish and Wildlife Director, and other necessary personnel. ORS 496.080.
[11] ORS 496.138:

"(1) The commission has the authority to formulate and implement the policies and programs of this state for the management of wildlife, and may perform all acts necessary to administer and carry out the provisions of the wildlife laws.
"(2) In accordance with any applicable provision of ORS 183.310 to 183.500, the commission may promulgate rules to carry out the provisions of the wildlife laws."