*287 WALTERS, J.,
dissenting.
Together, Article I, section 10, and Article I, section 17, ensure that an individual who suffers personal injury will have legal remedy for that injury, and that a jury will determine the extent of that injury and the monetary sum necessary to restore it. Together, those two provisions place coherent constitutional limitations on legislative action: The remedy clause precludes the legislature from denying remedy for personal injury, and the right to jury trial precludes the legislature from eliminating or interfering with the jury’s role in restoring that injury. But those two provisions also do more. They define what we mean when we use the word justice, and they make jurors its defender. Article I, section 10, stems from Lord Coke’s interpretation of the Magna Carta and his understanding that justice must be “full, because justice ought not to limp.” 359 Or at 200 (translating Edward Coke, The Second Part of the Institutes of the Laws of England 55-56 (1797 ed)). Article I, section 17, guarantees a right to a jury trial that is “one of the most important safeguards against tyranny which our law has designed.” Lee v. Madigan, 358 US 228, 234, 79 S Ct 276, 3 L Ed 2d 260 (1959).
Today, the majority not only deprives the Horton family of the right to the restorative remedy that the jury awarded, it also bargains away and belittles two constitutional provisions designed to guarantee justice for all. I dissent.
I.
The remedy clause guarantees that “every man shall have remedy by due course of law for injury done him in his person, property, or reputation.” Or Const, Art I, § 10. In this case, no one contests that plaintiff’s son suffered injury to his person; the question is whether the legislature violated his right to remedy for that injury when it imposed a cap on his damages. The majority begins its analysis of that question with Smothers v. Gresham Transfer, Inc., 332 Or 83, 23 P3d 333 (2001), a case that did not involve a damages cap. In fact, in Smothers, the court explicitly reserved the constitutionality of such caps for later decision. Id. at 120 n 19. That decision came in Clarke v. OHSU, 343 Or 581, *288 606, 175 P3d 418 (2007), and Clarke should have been the starting point for the court’s analysis here.
Before I explain how the majority should have used Clarke to resolve this case, I want to note my agreement with the majority’s clarification of the court’s decision in Smothers. I agree that the meaning of the remedy clause is not tied to its meaning in 1857. 359 Or at 187. That clarification is important, and it corrects the mistake that the court made in Howell v. Boyle, 353 Or 359, 298 P3d 1 (2013). In Howell, the court interpreted Smothers to require a two-step process to determine whether the remedy clause is violated. Id. at 385-86. First, the court said in Howell, a court must ascertain the damages that the plaintiff would have received at common law; then, the court must compare those damages to the damages that the plaintiff received at trial. Id. If the plaintiff would have received less at common law than the plaintiff received at trial, then, the court explained, capped damages can be considered “fully restorative” of a common-law negligence claim. Id. at 386 (internal quotation marks omitted). In reaching that conclusion, the court recognized that “it is exceedingly difficult to determine the state of Oregon law over 150 years ago,” but, it reasoned, “that is what Smothers requires.” Id.
If that case-within-a-case analysis is what Smothers requires, then it is important to disavow it. And it is equally important to disavow Howell. Howell was dependent on the same faulty reasoning that the majority identifies in Smothers, and, if the majority is correct that Smothers must be overruled because that court’s conclusion was dependent on faulty reasoning, then Howell, too, must be overruled. 359 Or at 183. That leaves us with Clarke, a case that the majority in this case does not overrule and that is not dependent on the faulty reasoning present in Smothers and Howell.
In Clarke, this court considered whether the capped damages that the Oregon Tort Claims Act (OTCA) provided were sufficiently restorative to satisfy the requirements of Article I, section 10. 343 Or at 588. The court viewed the plaintiffs economic damages of over $12 million as “representative of the enormous cost of lifetime medical care *289 currently associated with [the] permanent and severe personal injuries” that defendants had caused, and held that the capped damages available under the OTCA were insufficient and violated the remedy clause. Id. at 609-10. That analysis should have compelled the same result here. Plaintiffs economic damages of over $6 million are similarly “representative of the enormous cost of lifetime medical care currently associated with [the] permanent and severe personal injuries” that defendants caused. Id. at 609. And the capped damages available to plaintiff in this case are nowhere near capable of restoring those injuries. This court should have held that the limited remedy available to plaintiff was not sufficiently restorative to meet Article I, section 10, requirements.
The majority reasons otherwise. According to the majority, the disavowal of Smothers leaves us with all of the decisions in our remedy clause cases except Smothers, and the three categories into which the majority says those cases fall. This case, the majority says, falls into the second category—the category in which the legislature does not alter a defendant’s duty to exercise reasonable care but limits a plaintiffs remedy for breach of that duty as part of a “comprehensive statutory scheme intended to extend benefits to some persons while adjusting the benefits to others.” 359 Or at 221. For that category of cases, the majority opines, providing an “insubstantial remedy for a breach of a recognized duty” may violate the remedy clause. 359 Or at 219. However, the majority explains, when the legislature has sought to “adjust” a person’s rights and remedies “as part of a larger statutory scheme that extends benefits to some while limiting benefits to others,” a court can consider that “quid pro quo” in determining whether the remedy clause is violated. Id.
I agree with the majority that, to satisfy Article I, section 10, the remedy that the legislature provides cannot be “insubstantial.” By that, I take the majority to mean that the legislative remedy must be substantially restorative. As this court said in Clarke, “Article I, section 10, does not eliminate the power of the legislature to vary and modify both the form and the measure of recovery for an injury, as long *290 as it does not leave the injured party” with a remedy “that is incapable of restoring the right that has been injured.” 343 Or at 606 (internal quotation marks omitted). The court arrived at that understanding of the remedy clause by looking at its words and this court’s prior cases. When Article I, section 10, was drafted, the word “remedy” meant, among other things “that which counteracts an evil of any kind,” and “that which repairs loss or disaster.” Noah Webster, An American Dictionary of the English Language 837 (1854). And since 1925, this court has held that the right to a remedy precludes the legislature from taking an individual’s right to “a good common-law remedy for a private injury committed by a private citizen” and giving that individual a remedy that is “wholly inadequate” to its purpose. West v. Jaloff, 113 Or 184, 194-95, 232 P 642 (1925).
The overruling of Smothers neither compels nor permits a different conclusion. The words of the remedy clause continue to have substantially the same meaning that they had at common law, see Webster’s Third New Int’l Dictionary 1920 (unabridged ed 2002) (defining “remedy”), and West and Clarke are still good law. West was decided before Smothers-, Clarke discusses Smothers, but does not rely on the Smothers analysis that the majority here disavows. Clarke, 343 Or at 605-06. Accordingly, the proper remedy clause inquiry continues to be whether a statutory limitation on damages leaves the plaintiff with a remedy that is “incapable of restoring the right that has been injured.” Id. at 606 (internal quotation marks omitted; quoting Smothers, 332 Or at 119-20).
The majority does not reason otherwise. Instead, the majority relies on the second consideration that it finds applicable to this category of cases—the quid pro quo that results when the legislature has sought to adjust a person’s rights and remedies as “part of a larger statutory scheme that extends benefits to some while limiting benefits to others.” 359 Or at 219. Relying on only one case for that proposition, Hale v. Port of Portland, 308 Or 508, 523, 783 P2d 506 (1989), the majority concludes that, in this case, the state’s constitutionally recognized interest in sovereign immunity justifies the cap on plaintiffs damages. 359 Or at 224.
*291 In Clarke, the court did not consider the state’s interest in sovereign immunity in its analysis and cited Hale only to distinguish it. 343 Or at 608-09. In this case, the majority should have followed suit. As the court explained in Clarke, the statute that the court upheld in Hale limited the size of the award that a plaintiff could obtain from a municipal defendant, but it did not limit a plaintiffs right to obtain a fully compensatory award from municipal employees.[1] Id. Consequently, the plaintiff in Hale was entitled to a remedy capable of restoring his injuries, and the court had no cause to hold, and did not hold, that the legislature could deprive an individual of the right to a restorative remedy to extend a benefit to others. Hale, 308 Or at 523-24. In Hale, the court described the applicable limitation on damages as widening the class of plaintiffs who could recover for injuries against an otherwise immune municipality while at the same time imposing “a counterbalancing” limit on the size of the award that could be recovered. Id. at 523. However, that description of the statute did not represent the holding of the case. In fact, what the court said in Hale was that “all who had a remedy continue to have one.” Id. The majority in this case is wrong in departing from the interpretation of Hale provided by the unanimous court in Clarke.
The majority then compounds that error when it broadly reasons that the legislature may “extend [] an assurance of benefits to some while limiting benefits to others,” 359 Or at 224, effecting a “quid pro quo” 359 Or at 225. The remedy clause grants an individual right, not a bargaining chip. This court has never held, in this or any other context, that the legislature may bargain away an individual constitutional right for something of benefit to others, and the majority jeopardizes all individual rights by starting down that path.[2]
*292 And even if a bargain such as that described in Hale were permitted, no such bargain is provided or permitted here. In this case, the OTCA does not provide this plaintiff or this class of plaintiffs with a benefit of constitutional dimension such as that provided in Hale. This plaintiffs claim is a claim against a governmental employee.[3] Governmental employees are not entitled to sovereign immunity, and, absent the OTCA, all plaintiffs injured by governmental employees would have claims against those employees for unlimited damages. See Gearin v. Marion County, 110 Or 390, 396-97, 223 P 929 (1924) (county employees not entitled to sovereign immunity). The OTCA does not widen the class of plaintiffs entitled to sue that class of defendants. Thus, the constitutional benefit that was described in Hale—the widening of the class of plaintiffs who could sue the relevant class of defendants (there, municipalities)—is not present here. Hale, 308 Or at 523.
The OTCA also does not provide plaintiffs with a benefit of practical consequence. The OTCA does permit plaintiffs to recover from governmental entities but limits the amount that plaintiffs may recover from those entities. Plaintiffs’ common-law right against individual governmental employees is a right to unlimited damages. An exchange of that right for the right, under the OTCA, to seek a more limited remedy from a governmental entity may or may not be of practical value to this class of plaintiffs. For instance, in this case, the state’s waiver of immunity and its duty to indemnify defendant did not confer a benefit that plaintiff would not have had but for the OTCA. Like all physicians, defendant here had his own liability insurance. Absent the OTCA, that insurance would have been available to cover the costs of defendant’s negligence.[4]
*293 Furthermore, a plaintiffs ability to collect a judgment is not a benefit of constitutional dimension and can have no place in the court’s constitutional analysis. See Oregonian Publishing Co. v. O’Leary, 303 Or 297, 305, 736 P2d 173 (1987) (witness’s interest in secrecy is not of constitutional dimension in Article I, section 10, analysis); Mattson v. Astoria, 39 Or 577, 580-81, 65 P 1066 (1901) (when plaintiff has claim against individual employee, plaintiff is not wholly without remedy); Batdorff v. Oregon City, 53 Or 402, 408-09, 100 P 937 (1909) (same).
The majority does not grapple with those concerns. Instead, the majority focuses on the benefit that the state receives in the bargain. The majority explains that the OTCA “accommodates the state’s constitutionally recognized interest in asserting its sovereign immunity with the need to indemnify its employees.” 359 Or at 222 (emphasis added). It is true that the state has a constitutional interest in sovereign immunity, but its choice to indemnify its employees is a choice of practical, and not of constitutional, significance. The state is immune from suit because it is a sovereign. By design, sovereign immunity does not extend to state employees; state employees, including those who perform important, high-risk functions, are liable for their torts. See Gearin, 110 Or at 396 (county employees). Thus, although the state can act only through its agents and employees, the individual liability of state employees is an inherent limitation on the state’s immunity. The state may choose to assure its employees that they will be indemnified for their negligence, but it does not need to do so. Private employers, by law, are vicariously liable for the torts of their employees. Minnis v. Oregon Mutual Ins. Co., 334 Or 191, 201, 48 P3d 137 (2002). Although the state may wish to compete with private employers by placing itself on the same footing, its voluntary choice to do so is not an interest of constitutional dimension.
The idea that the Oregon Constitution permits the legislature to bargain away a plaintiffs constitutional right to remedy in these circumstances is so repugnant that I wonder whether the majority means to endorse it. Perhaps, instead, what the majority intends to endorse is balancing— *294 a weighing of the competing individual and state constitutional interests. Balancing may seem more acceptable than bargaining, but it has no greater textual support in Article I, section 10, and it has the same potential to trump and thereby trample constitutional rights. Until this day, a bedrock of our constitutional jurisprudence has been that “a state legislative interest, no matter how important, cannot trump a state constitutional command.” State v. Stoneman, 323 Or 536, 542, 920 P2d 535 (1996). In Oregonian Publishing Co., 303 Or at 302, this court said that “[s]ection 10 is written in absolute terms; there are no explicit qualifications to its command that justice shall be administered openly.” As a result, the court rejected the idea that it was appropriate to balance the secrecy interests of a witness who would be compelled to testify at a hearing against the interests of those who sought an open court. Id. at 305. The same is true of section 10's guarantee that “every” person “shall” have remedy for personal injury. That guarantee is written in absolute terms and should not be subject to balancing.
If that is what the majority intends, then, in its stare decisis analysis, the majority should, at the very least, have acknowledged the fundamental change that it is making and provided a firm basis for its departure. And the majority should candidly have explained how the constitutional right to remedy, which this court described in Gearin, 110 Or at 396, as “one of the most sacred and essential of all the constitutional guaranties” without which “a free government cannot be maintained or individual liberty be preserved,” will be given the weight necessary to ensure that it is not easily overborne by the interests of the day.
The majority reassures us that its holding in this case is limited to cases in which the OTCA is applicable— cases in which the state has a constitutional interest in sovereign immunity. The majority also expresses no opinion on whether damages caps which do not implicate the state’s sovereign immunity and are not a part of the quid pro quo that the majority sees in the OTCA would comply with Article I, section 10. 359 Or at 225-26. And even when the OTCA applies, the majority “doubt[s] highly” that the legislature’s interest in sovereign immunity would justify a damages cap *295 that results in a plaintiff receiving a “paltry fraction” of the damages that the plaintiff incurred. 359 Or at 224 n 28.
That handle of hope is helpful, but it does little for plaintiff and her son, Tyson, and those who suffer similar tragic consequences at the hands of governmental employees.[5] And it does little for those who are unable to determine, before a jury renders its verdict, what fraction of damages the statutory cap on damages will represent, and therefore whether or not a defendant’s liability will be limited. As the Chief Justice has written,
“Although balancing provides flexibility to courts in making their determinations, it can result in ad hoc decisions that are unpredictable and that provide little guidance to citizens, government officials, and lower courts.”
Thomas A. Balmer & Katherine Thomas, In the Balance: Thoughts on Balancing and Alternative Approaches in State Constitutional Interpretation, 76 Alb L Rev 2027, 2046 (2013).
Apparently what the majority envisions in future cases is post hoc weighing that will make the validity of statutory limitations dependent on (1) the fraction produced by dividing a plaintiffs limited damages by the damages that the jury assessed and (2) a judicial assessment of the importance of the state’s constitutional interest in imposing the limitation. That post hoc weighing obviously satisfies a majority of this court, but it is a far cry from the absolute guarantee that Article I, section 10, provides.
And the majority’s post hoc weighing is not the only way to give effect to the proposition that Article I, section 10, does not guarantee a perfect remedy. In Clarke, the court recognized that, although Article I, section 10, places limits on legislative authority, it also permits the exercise of that authority within constitutional bounds. If the legislature were to provide for a restorative, although imperfect, remedy in a way that would be equally restorative to all injured persons, it is possible that its exercise of authority would *296 be upheld. But a monetary cap on damages does not have the same restorative effect for all persons regardless of the degree of injury, and it therefore does not meet the dictates of Article I, section 10, in instances in which it permits some a perfect remedy and others a pittance.
I recognize the many dilemmas that the state legislature faces and its intention to enact laws for the common good. That is the legislature’s job. But it is the court’s job to ensure that the legislature’s well-intended efforts do not result in the loss of individual rights. A court cannot “‘balance’ one person’s rights with cumulated majoritar-ian interests” without “fl[ying] in the face of the premise of constitutionally guaranteed individual rights against the state.” State v. Tourtillott, 289 Or 845, 881, 618 P2d 423 (1980) (Linde, J., dissenting). This court’s duty is to ensure that the legislature’s laudable intent to benefit the many does not trump and trample the rights of the one. We do not fulfill that duty in this case.
II
The leading case for the proposition that Article I, section 17, precludes the legislature from eliminating or interfering with the jury’s fact-finding function is Molodyh v. Truck Insurance Exchange, 304 Or 290, 744 P2d 992 (1987). The majority endorses and does not overrule that case. In Molodyh, the court held that Article I, section 17, precludes the legislature from eliminating the jury’s fact-finding function by giving an insurer the right to have a panel of three appraisers decide the amount of loss in a contract case, rather than leaving that task to a jury. Id. at 295-97. In Lakin v. Senco Products, Inc., 329 Or 62, 82, 987 P2d 463 (1999), this court relied on Molodyh and held that Article I, section 17, also precludes the legislature from interfering with the jury’s fact-finding function by requiring a court to enter judgment for a pre-determined amount rather than the amount determined by the jury.
Neither Molodyh nor Lakin limits the legislature’s authority to alter or adjust a party’s legal claim; both stand for the proposition that, when a plaintiff has a legal claim, it is the jury, and not the legislature or persons designated by the legislature, that must decide the facts of that claim. *297 Molodyh, 304 Or at 296-97; Lakin, 329 Or at 71. In Jensen v. Whitlow, 334 Or 412, 422, 51 P3d 599 (2002), the court explained Lakin in precisely those terms:
“ [B] ecause the plaintiffs had the right to bring a civil action to which the right to a jury trial was attached, Article I, section 17, prohibited the legislature from interfering with or interrupting that right by imposing a cap on the amount of noneconomic damages that the jury could award.”
(Emphasis added.)
To overrule Lakin, the majority instead reads that case as holding that Article I, section 17, provides a constitutional right to compensatory damages and precludes the legislature from prescribing the elements of a claim, including recoverable damages. 359 Or at 243-44. To demonstrate that Article I, section 17, does not preclude that law-making authority, the majority cites Hale v. Groce, 304 Or 281, 284, 744 P2d 1289 (1987), and Fazzolari v. Portland School Disk No. 1J, 303 Or 1, 17, 734 P2d 1326 (1987), for the proposition that courts have authority to limit the class of persons to whom a defendant owes a duty and to require that recoverable damages be foreseeable. 359 Or at 244-45. From that judicial authority, the majority apparently reasons that the legislature can impose comparable limits. I do not disagree. Subject to constitutional limits other than Article I, section 17, both the court and the legislature have authority to define the elements of a tort claim and to determine the types of damages that are recoverable. But that is not what the legislature did when it adopted the damages cap at issue here. The statute under scrutiny in this case does not change the elements of a common-law claim or determine the types of recoverable damages; it requires that a court enter judgment for an amount of damages different than the amount awarded by a jury. ORS 30.269(3). It is one thing to say, correctly, that the court and the legislature can change the common law; it is quite another to say that the legislature can preclude a plaintiff from obtaining the benefit of a jury’s award under existing common law.
Under the common law as it exists today, a plaintiff who is physically injured by a negligent defendant has a common-law tort claim and may recover damages sufficient *298 to compensate the plaintiff for the economic and noneconomic losses caused by the defendant’s negligence. See, e.g., Lakin, 329 Or at 73; Smitson v. Southern Pac. Company, 37 Or 74, 95-96, 60 P 907 (1900); Oliver v. N. P. T. Co., 3 Or 84, 88 (1869). Accordingly, in this case, the trial court instructed the jury that “ [y] ou must decide the amount of plaintiffs damages”; that “plaintiff must prove economic and non-economic damages by a preponderance of the evidence”; that “[t]he total amount of economic damages may not exceed the sum of $17,678,681”; and that “[t]he amount of non-economic damages may not exceed the sum of $15 million.” And, in this case, the jury returned with a verdict for plaintiff in the sum of $12,071,190.38. Article I, section 17, precludes the legislature from interfering with that verdict, which was entered in accordance with existing common law.
That that is true is clear not only from Article I, section 17, but also from Article VII (Amended), section 3, which provides:
“In actions at law, where the value in controversy shall exceed $750, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict.”
As the majority correctly recognizes, that section’s purpose is “to eliminate, as an incident of a jury trial in this state, the common-law power of a trial court to re-examine the evidence and set aside a verdict because it was excessive or in any other respect opposed to the weight of the evidence.” 359 Or at 253 (emphasis added; internal quotation marks and citation omitted). That constitutional provision precludes a trial court from instructing a jury to award a plaintiff her economic and noneconomic damages and then, after the verdict is rendered, setting aside the verdict because it exceeds some sum, that, in the court’s view, renders it excessive. Van Lom v. Schneiderman, 187 Or 89, 95-97, 210 P2d 461 (1949). It also precludes an appellate court from setting aside or modifying a jury’s factual determination of damages following a fair trial. Tenold v. Weyerhaeuser Co., 127 Or App 511, 523, 873 P2d 413 (1994). In either instance, a court’s *299 nullification of a jury’s finding of damages would violate both Article VII (Amended), section 3, and Article I, section 17. And the legislature cannot instruct a court to do what the constitution forbids. Such an instruction constitutes an unlawful interference with the jury’s fact-finding function.
A damages cap is not the same as a legal rule that a defendant does not owe a duty to a particular class of plaintiffs or that damages must be foreseeable. A damages cap is nothing more than an arbitrary decision that, although a plaintiff has sustained damages measured according to existing legal principles in an amount assessed by the jury, those damages are excessive and must be reduced.
Courts in other jurisdictions agree and have held that, although a state legislature has authority to make or amend the common law, the constitutional right to jury trial precludes the legislature from interfering with a jury’s fact-finding role by reducing a jury’s factual determination of damages to a predetermined amount. In Sofie v. Fibreboard Corp., 112 Wash 2d 636, 656, 771 P2d 711, 721-22 (1989), the Washington Supreme Court rested its decision on the word “inviolate” in Article 1, section 21, of the Washington Constitution. The court explained that
“the plain language of [A]rticle 1, section 21 [,] provides the most fundamental guidance: ‘The right of trial by jury shall remain inviolate.’ The term ‘inviolate’ connotes deserving of the highest protection. Webster’s Third New International Dictionary 1190 (1976), defines ‘inviolate’ as ‘free from change or blemish : pure, unbroken * * * free from assault or trespass : untouched, intact * * *.’ Applied to the right to trial by jury, this language indicates that the right must remain the essential component of our legal system that it has always been. For such a right to remain inviolate, it must not diminish over time and must be protected from all assaults to its essential guarantees. In Washington, those guarantees include allowing the jury to determine the amount of damages in a civil case.”

Id.

The Washington Supreme Court responded to the argument that a damages cap was a permissible exercise of the legislature’s law-making power by citing the following passage *300 from a federal district court as providing “insightful distinctions between what the [legislature can and cannot do”:
“Unquestionably, the legislature may pass measures which affect the way a jury determines factual issues. The legislature may prescribe rules of procedure and evidence, create legal presumptions, allocate burdens of proof, and the like. Just as certainly, the legislature may abolish a common law right of action and, if it desires, replace it with a compensation scheme. The legislature may even make rules concerning the type of damages recoverable and the way in which damages are paid. But the legislature may not preempt a jury’s findings on a factual issue which has properly been submitted to the jury.”
Id. at 657, 771 P2d at 722 (internal quotation marks omitted; quoting Boyd v. Bulala, 647 F Supp 781, 789-90 (WD Va 1986)). The Washington Supreme Court agreed and expressed the same thought this way:
“It is entirely within the [l]egislature’s power to define parameters of a cause of action and prescribe factors to take into consideration in determining liability. This is fundamentally different from directly predetermining the limits of a jury’s fact-finding powers in relevant issues, which offends the constitution.”
Id. at 666, 771 P2d at 727. A contrary argument, the court explained,
“ignores the constitutional magnitude of the jury’s fact-finding province, including its role to determine damages. [To argue contra is to assert] that the right to trial by jury is not invaded if the jury is allowed to determine facts which go unheeded when the court issues its judgment. Such an argument pays lip service to the form of the jury but robs the institution of its function. This court will not construe constitutional rights in such a manner. As we once stated: ‘The constitution deals with substance, not shadows. Its inhibition was leveled at the thing, not the name [***]. If the inhibition can be evaded by the form of the enactment, its insertion in the fundamental law was a vain and futile proceeding.’”
Id. at 656, 771 P2d at 721 (quoting State v. Strasburg, 60 Wash 106, 116, 110 P 1020, 1023 (1910)) (internal quotation marks from Strasburg omitted).
*301 This court adopted that analysis in Lakin and did so after considering and rejecting the defendant’s position that a damages cap was but a declaration of the legal consequences of facts, and not an interference with the jury’s authority to decide the facts.[6] 329 Or at 79-80. Before it reached its conclusion, the court also considered cases from other jurisdictions that supported the defendant’s view; the court gave those cases its attention but was satisfied that the conclusion that it reached was “supported by the better-reasoned authorities.” Id. at 81.
Today, those authorities include a number of cases that the Lakin court did not have the opportunity to consider. In some of those cases, the courts, like the courts in Sofie and Lakin, have noted the plain meaning of the word “inviolate.”[7] And in one of those cases, the court states succinctly what this court said in Lakin and should continue to say: A damages cap “nullifies the jury’s findings of fact regarding damages and thereby undermines the jury’s basic function.” Atlanta Oculoplastic Surgery, P.C. v. Nestlehutt, 286 Ga 731, 735, 691 SE2d 218 (2010).
I realize that other courts have reached different conclusions, but I point to the cases that support this court’s decision in Lakin to spotlight the fact that the differing conclusions that courts reach arise from differences about what does or does not constitute a nullification of, or interference with, the jury’s fact-finding function, not from differences about the jury’s constitutional role as factfinder.
In this case as well, the difference between the majority’s analysis and the analysis of the unanimous court in Lakin is not found in differences about the text or history of Article I, section 17, and the jury’s role as factfinder. Like the majority in this case, the court in Lakin cited to Blackstone for the proposition that the jury trial was considered “the glory of the English law.” 359 Or at 235 (quoting *302 Lakin, 329 Or at 70). Lakin also quoted from Dimick v. Schiedt, 293 US 474, 485-86, 55 S Ct 296, 79 L Ed 603 (1935), for the proposition that the right to jury trial is a right to have a jury serve as a fact-finding body:
“[T]rial by jury has always been, and still is, generally regarded as the normal and preferable mode of disposing of issues of fact in civil cases at law as well as in criminal cases. Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care.”
329 Or at 71 (emphasis added; internal quotation marks omitted). Although the majority provides additional history demonstrating that the right to have a jury determine the facts in a civil case was of significance not only to Blackstone and to the Britons but also to the colonists, and that the framers were aware that judges and legislators retained the power to make law, the majority’s history goes no further. For instance, that history does not indicate that the drafters of Article I, section 17, or its federal counterpart affirmatively intended to permit damages caps. Damages caps did not exist at common law; they are a modern innovation. Nor does that history indicate that the drafters were affirmatively unconcerned with judicial or legislative encroachment on the jury’s fact-finding role, or that they considered that role to be insignificant.
The source that the majority most relies on in its review of the history of the civil right to jury trial is Charles W. Wolfram, The Constitutional History of the Seventh Amendment, 57 Minn L Rev 639 (1973). In that article, the author examines historical materials in an attempt to determine what the proponents of the Seventh Amendment sought to accomplish by its adoption, and, although recognizing certain methodological constraints, reaches a number of significant conclusions. Specifically, the author concludes that “it is clear that the amendment was meant by its proponents to do more than protect an occasional civil litigant against an oppressive and corrupt federal judge—although it certainly was to perform this function as well.” Id. at 653. Rather, “[t]here was a substantial sentiment to preserve a *303 supposed functioning of the jury that would result in ad hoc ‘legislative’ changes through the medium of the jury’s verdict.” Id. “Juries,” the author concludes, “were sought to be thrust into cases to effect a result different from that likely to be obtained by an honest judge sitting without a jury.” Id. In fact, the author opines, “[t]he effort was quite clearly to require juries to sit in civil cases as a check on what the popular mind might regard as legislative as well as judicial excesses.” Id.
The majority does not disagree. All that is new in the majority’s analysis is this: The Lakin court judged the damages cap at issue in that case to be an interference with a jury’s factual assessment of damages; the majority in this case considers the imposition of a damages cap to be within the legislature’s law-making power. That difference is apparent, but it cannot be explained by the majority’s expanded historical analysis.
Nor can it be explained by the majority’s discussion of our decisions in cases other than Lakin. Molodyh precludes legislative interference with the jury’s fact-finding function, and Lakin is in accord. To the majority’s point that DeMendoza v. Huffman, 334 Or 425, 51 P3d 1232 (2002), a case decided after Lakin and that distinguishes Lakin, provides a basis for now overruling it, I question whether the majority is wise to give this and future courts that liberal a leash. The rule of stare decisis is essential to the public’s confidence that the law is more than a reflection of personal preference, and the public’s confidence in the law is the fragile foundation on which our system of justice rests.
In relying on DeMendoza to overrule Lakin, the majority points to its statement that, if a right to receive an award that reflects the jury’s determination of the full amount of damages exists, “then it must arise from some source other than Article I, section 17.” 359 Or at 229 (internal quotation marks omitted; quoting DeMendoza, 334 Or at 447). The majority contends that, in that regard, DeMendoza “cannot be fairly reconciled with Lakin." 359 Or at 231. But in DeMendoza, the court reaffirmed the court’s conclusion in Lakin that a plaintiff had a right to compensatory damages that arose from a source other than Article I, *304 section 17. 334 Or at 447. The court explained that the right to receive an award of compensatory damages that reflects a jury’s determination of those damages arises from the existing common-law right to compensatory damages together with the right, under Article I, section 17, to have a jury determine the amount of those damages. Id. at 446-47. In DeMendoza, the court contrasted a plaintiffs right to receive jury-awarded compensatory damages with a plaintiffs right to receive jury-awarded punitive damages and concluded that a plaintiff has no right to the latter. Id. at 447. Perhaps the court’s reasoning was that Article I, section 10, provides a plaintiff with a right to consequential damages, which are necessary to restore a plaintiffs injury, but not to punitive damages, which are awarded to deter wrongful conduct.[8] Or perhaps the court was incorrect in treating compensatory and punitive damages differently in its Article I, section 17, analysis. But whatever its reasoning, DeMendoza and Lakin consistently recognize that a plaintiff does have a right to receive jury-awarded compensatory damages. The two cases are not at odds in that regard.
Furthermore, the statute at issue in DeMendoza— ORS 18.540—provided that a portion of the damages assessed by a jury would be distributed to the state. In holding that that statute did not violate Article I, section 17, or Article VII (Amended), section 3, the court distinguished not only between punitive and compensatory damages, but also between caps and the distribution scheme found in ORS 18.540. Id. at 447-48. The court reasoned that the effect of ORS 18.540 was not to modify a jury’s assessment of punitive damages but, instead, to modify the way in which those damages were distributed. Id. at 447. The distribution of damages, the court said, “is not a factual determination that a jury makes.” Id. (emphasis in original). The court may have been discussing Article VII (Amended), section 3, when it gave that explanation, but its distinction applies equally to Article I, section 17.
*305 The majority is wrong to conclude that the court’s decision in DeMendoza “cannot be fairly reconciled with Lakin” 359 Or at 231, and the majority aggravates that error by using that standard to overrule Lakin. When, in Couey v. Atkins, 357 Or 460, 520, 355 P3d 866 (2015), a unanimous court disavowed Yancy v. Shatzer, 337 Or 345, 97 P3d 1161 (2004), in favor of Kellas v. Dept. of Corrections, 341 Or 471, 145 P3d 139 (2006), it determined that “if Yancy was correctly decided, then it would seem necessarily to follow that ORS 14.175 is unconstitutional. But if Kellas applies, there would seem to be no constitutional impediment to the legislature conferring the authority to review otherwise moot cases that are capable of repetition, yet evading review.” Couey, 357 Or at 489. Yancy and Kellas were diametrically opposed; the same cannot be said for Lakin and DeMendoza. In DeMendoza, the court was well aware of its decision in Lakin and reaffirmed and distinguished it. Here, the majority not only fails to follow Lakin, it also fails to follow DeMendoza and its recognition that a plaintiff has a right to receive an award that reflects the jury’s determination of compensatory damages.
Nor can the court’s decision in Hughes v. PeaceHealth, 344 Or 142, 178 P3d 225 (2008), constitute a basis for overruling Lakin. In Hughes, the plaintiff brought a statutory claim for wrongful death and challenged the statutory limitation on damages on both remedy clause and jury trial grounds. Id. at 145. The majority reasoned that the plaintiff had no right to remedy under Article I, section 10, because, under Smothers, the plaintiff had failed to persuade the court that she would have had a wrongful death claim at common law. Id. at 152. In this case, the majority overrules Smothers and, thus, the premise for the court’s decision in Hughes. The majority should not give effect to Hughes or use it as a basis for overruling Lakin. In addition, like the court in DeMendoza, the court in Hughes distinguished Lakin. Id. at 154. If the majority is going to give effect to Hughes, it also should give effect to the distinction that it drew. In Hughes, the court explained that because the plaintiff had no right to recover any damages under Article I, section 10, the plaintiffs right to have a jury determine the amount of his damages was not violated. Id. at 155-57. If the court *306 was correct in that reasoning, its decision does not call the result in Lakin into question or compel a different result in this case. In Lakin, unlike in Hughes, the plaintiff had a right to a remedy under Article I, section 10, and the same is true of plaintiff here. The majority departs from the rule of stare decisis when it fails to follow Lakin, and it errs in using Hughes to do so.
The principle of stare decisis does not fulfill its purpose if we reconsider at will the decisions and distinctions of prior courts. Instead, we should assume that our “fully considered prior cases are correctly decided” unless we can say that the constitutional rule at issue “was not formulated either by means of the appropriate paradigm or by some suitable substitute.” State v. Ciancanelli, 339 Or 282, 290-91, 121 P3d 613 (2005). A majority of the present court may disagree with the result that the unanimous court reached in Lakin, but it cannot say that that standard has been met here.
Moreover, the majority did not have to overrule Lakin to make clear that the right that Article I, section 17, grants is a procedural right to have a jury decide the facts in a case and not a right to a particular common-law claim or to unlimited damages. It was unnecessary for the majority to erect and topple a straw man to reach that conclusion. And more importantly, the fact that the right to jury trial is a procedural right does not take anything from it. The procedural right to jury trial guarantees that plain people will decide the facts of a case. It is more than a right to have a jury empanelled; it is a right to have a jury perform its fact-finding function without interference.
The court that decided Molodyh would not have permitted the legislature to write its way around Article I, section 17, by enacting a law that permitted the parties to an insurance contract to try their case to a jury, but then required the court to enter judgment for the damages determined not by the jury, but by three appraisers. And this court should not permit the legislature to write its way around Article I, section 17, by enacting a law that permits parties to a negligence claim to try their case to a jury, but requires the court to enter judgment *307 for the damages determined not by the jury, but by the legislature.
Labeling the right to civil jury trial as a procedural right does not diminish its significance in our governmental structure. In Blakely v. Washington, 542 US 296, 305-06, 124 S Ct 2531, 159 L Ed 2d 403 (2004), the United States Supreme Court described the role of the jury in a criminal trial as “no mere procedural formality, but a fundamental reservation of power in our constitutional structure.”[9] The same is true of the jury’s role in civil trials. The framers did not consider the right to civil juries essential only because juries are particularly well suited to the fact-finding function. They also considered juries as playing an essential political role in our democratic system of government. As the anonymous “Federal Farmer” said in one of the author’s letters to “The Republican,”
“The jury trial, especially politically considered, is by far the most important feature in the judicial department in a free country ***. Juries are constantly and frequently drawn from the body of the people, and freemen of the country; and by holding the jury’s right to return a general verdict in all cases sacred, we secure to the people at large, their just and rightful contr[ol] in the judicial department. * * * The body of the people, principally, bear the burdens of the community; they of right ought to have a contr[ol] in its important concerns, both in making [by legislation] and executing [through juries] the laws, otherwise they may, in a short time, be ruined.”
*308 Herbert J. Storing ed., The Complete Anti-Federalist Vol 2, 320 (1981).
Thus, as Alexis de Tocqueville explained, “[t]he jury is, above all, a political institution, and it must be regarded in this light in order to be duly appreciated.” Alexis de Tocqueville, Democracy in America 282 (Phillips Bradley ed., 1946) (originally published 1835). De Tocqueville described the civil jury as placing “the real direction of society in the hands of the governed, or of a portion of the governed, and not in that of the government.” Id. The civil jury system, Blackstone explained, “preserves in the hands of the people that share which they ought to have in the administration of public justice, and prevents the encroachments of the more powerful and wealthy citizens.” William Blackstone, 3 Commentaries on the Laws of England 380 (1st ed 1768). It is to jurors—plain people—that we have often looked to defend our constitutional rights “against the importunities of judges and despite prevailing hysteria and prejudices.” Toth v. Quarles, 350 US 11, 17-19, 76 S Ct 1, 100 L Ed 8 (1955). We lose that strength when we permit interference with that function.
III
Together Article I, section 10, and Article I, section 17, provide a constitutional structure that is designed to provide justice for all and a means to preserve justice for all. Today, the majority does real damage to that structure and to the real people it is intended to protect. I dissent.
Baldwin, J., joins in this dissenting opinion.

 The case that the court in Hale cited in support of its conclusion was Noonan v. City of Portland, 161 Or 213, 88 P2d 808 (1939), a case in which the court upheld a charter provision that made city employees liable for negligence, but granted immunity to the city itself.

 I do not mean to suggest that the legislature is precluded from providing all injured persons with a substituted restorative remedy that is different from the remedy available at common law. What I mean is that the legislature is precluded from providing one injured person with a less than restorative remedy to extend benefits of constitutional dimension to others.

 Plaintiffs claim at issue on appeal is a claim against a state employee. Plaintiff also brought a claim against OHSU, but the trial court ruled that, because sovereign immunity applies to OHSU, the legislature constitutionally may limit the damages for which OHSU is liable. See Clarke, 343 Or at 600 (so holding). Plaintiffs claim against OHSU is not at issue on appeal.

 Although the majority labels defendant’s transection of blood vessels “inadvertent!],” 359 Or at 171, and although defendant’s act was certainly not intentional, it is more correct to acknowledge that defendant’s act was negligent. The purpose of liability insurance is to ensure that the costs of a tortfeasor’s negligence are not borne by the person whom the tortfeasor injures.

 In this case, Tyson’s undisputed past medical costs alone were more than $4 million; Tyson requires ongoing care and, despite receiving payment of the capped amount, Tyson’s parents owe $2.6 million for Tyson’s past medical care.

 See Petitioner’s Opening Brief at 11, Lakin v. Senco Products, Inc., 329 Or 62, 987 P2d 68 (1999) (S044110) (“Juries do not determine the legal consequences of the facts they find.”).

 Those cases include Watts v. Lester E. Cox Med. Ctr., 376 SW3d 633 (Mo 2012); Knowles v. United States, 544 NW2d 183 (SD 1996); and Moore v. Mobile Infirmary Ass’n, 592 So 2d 156 (Ala 1991).

 The majority refuses to so interpret DeMendoza because, it says, the court in Lakin considered Article I, section 10, irrelevant to its Article I, section 17, analysis. 359 Or at 230. That Lakin may not have recognized the relevance of Article I, section 10, in its analysis, however, is no reason to overrule its holding. DeMendoza did not do so.

 The court in Blakely, 542 US at 306, went on to explain:
“Just as suffrage ensures the people’s ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary. See Letter XV by the Federal Farmer (Jan 18, 1788), reprinted in 2 The Complete Anti-Federalist 315, 320 (H. Storing ed., 1981) (describing the jury as ‘securing] to the people at large, their just and rightful contr[ol] in the judicial department’); John Adams, Diary Entry (Feb 12,1771), reprinted in 2 Works of John Adams 252, 253 (C. Adams ed., 1850) (‘[T]he common people, should have as complete a control *** in every judgment of a court of judicature’ as in the legislature); Letter from Thomas Jefferson to the Abbé Arnoux (July 19, 1789), reprinted in 15 Papers of Thomas Jefferson 282, 283 (J. Boyd ed., 1958) (‘Were I called upon to decide whether the people had best be omitted in the Legislative or Judiciary department, I would say it is better to leave them out of the Legislative’); Jones v. United States, 526 US 227, 244-48, [119 S Ct 1215, 143 L Ed 2d 311] (1999).”